# EXHIBIT A

NK:ALC/PTH
F. #2016R01805

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

JEFFREY CHARTIER,
STEPHANIE LEE,
LAWRENCE ISEN,
MICHAEL WATTS,
ROBERT GLECKMAN,
ERIK MATZ,
RONALD HARDY,
BRIAN HEEPKE,
    also known as "Brian Targis,"
DENNIS VERDEROSA,
EMIN L. COHEN,
    also known as "Ian Grant,"
ANTHONY VASSALLO,
PAUL EWER,
MCARTHUR JEAN,
    also known as "John McArthur,"
ASHLEY ANTOS,
ROBERT GILBERT and
SERGIO RAMIREZ,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUL 1 1 2017   ★

BROOKLYN OFFICE

INDICTMENT

Cr. No. _____
(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18,
U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1),
982(b)(1), 1349, 1956(h), 1957(b),
1957(d)(1), 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))



GLASSER, J.

MANN. M.J.

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    The Corrupt Boiler Room and Related Entities

1.    My Street Research was a purported financial services business

headquartered in Melville, New York, which promoted the stocks of publicly traded companies

to individual investors, primarily through cold-call campaigns and the circulation of a newsletter. My Street Research was founded under the name Dacona Financial and thereafter changed its name to Power Traders Press ("PTP"), then to Trade Masters Pro and, most recently, to My Street Research. Dacona Financial, PTP, Trade Masters Pro and My Street Research (collectively, the "Boiler Room") all operated from the same office in Melville, New York, and kept substantially the same management despite the changes in the Boiler Room's name. The Boiler Room had various bank and brokerage accounts in its name, including, inter alia, brokerage accounts in the name of PTP (the "PTP Brokerage Accounts"). The Boiler Room maintained an Internet presence with more than one website from approximately 2014 through 2017. One or more of these websites marketed the Boiler Room as an "unbiased stock research firm" that provided "top notch, detailed, unbiased research."

2.      Elite Stock Research ("ESR") was a purported financial services business headquartered in Plainview, New York that promoted the stocks of publicly traded companies to individual investors, primarily through cold-call campaigns and the circulation of a newsletter. Certain individuals who worked at ESR also worked at the Boiler Room, and ESR promoted some of the same publicly traded companies' stocks that the Boiler Room promoted. ESR had brokerage accounts in its name (the "ESR Brokerage Accounts").

3.      National Waste Management Holdings, Inc. ("NWMH") was a publicly traded company with its principal place of business in Hernando, Florida that purported to be a solid waste management company. NMWH was incorporated in Florida in or about 2010 under the name Kopjaggers, Inc., with the purported business purpose of purchasing and selling artwork. In or about June 2014, Kopjaggers merged with a waste management company and

2

purportedly ceased artwork-related operations. In or about October 2014, Kopjaggers changed its name to NWMH and effected a stock split.

4. CES Synergies, Inc. ("CESX") was a publicly traded company with its principal place of business in Crystal Springs, Florida that purported to be an asbestos abatement and demolition firm. CESX operated through its subsidiary Cross Environmental Services, Inc.

5. Grilled Cheese Truck ("GRLD") was a publicly traded company with its principal place of business as of March 2015 in Fort Lauderdale, Florida that purportedly operated food trucks. As of approximately January 2016, GRLD changed its name to American Patriot Brands, and as of March 2016, its principal place of business was in Newport Beach, California.

6. Hydrocarb Energy Corporation ("HECC") was a publicly traded company with its principal place of business in Houston, Texas that purportedly operated as a petroleum exploration and production company. On or about April 16, 2016, HECC filed for bankruptcy.

7. Intelligent Content Enterprises, Inc. ("ICEIF") was a publicly traded company with its principal place of business in Toronto, Canada, which purported to operate an expanding portfolio of websites through its subsidiary, Digital Widget Factory, Inc.

8. Strategic Capital Markets ("SCM") was a purported investor relations and marketing firm with its principal place of business in Tampa, Florida. SCM was engaged by CESX and NWMH as their investor relations firm from approximately 2013 until approximately June 2015. SCM had a brokerage account in its name as of approximately December 2013 (the "SCM Brokerage Account").

9. Type A Partners, Inc. ("Type A Partners") was a purported investor relations and marketing firm with its principal place of business in St. Petersburg, Florida. Type

3

A Partners had brokerage accounts in its name as of approximately January 2014 (the "Type A Partners Brokerage Accounts").

10.     Marketbyte, LLC ("Marketbyte") was a purported investor relations and marketing firm with its principal place of business in San Diego, California.

11.     Geoserve Marketing LLP ("Geoserve") was a purported marketing firm with its principal place of business in Sugar Land, Texas.

12.     Snap or Tap Productions LLC ("Snap or Tap Productions") was an entity with its principal place of business in Tarzana, California.

13.     Accredited Investor Preview ("AIP") was a purported financial services company with its principal places of business in Melville, New York, and Cold Spring Harbor, New York.

II.     Relevant Regulatory Principles and Definitions

14.     A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

15.     The term "beneficial owner" was defined under the rules of the U.S. Securities and Exchange Commission ("SEC"). It included any person who directly or indirectly shared voting power or investment power (i.e., the power to sell a security). When a person or group of persons acquired beneficial ownership of more than five percent of a voting class of a company's equity securities registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act"), they were required to file a Schedule 13D with the SEC. A Schedule 13D reported the acquisition and other information within 10 days after the purchase and, in addition to being filed with the SEC, was provided to the company that issued the securities and each

4

exchange on which the securities were traded. Any material changes in the facts contained in the schedule required a prompt amendment.

16.     An "affiliate" of a publicly traded company generally referred to a person, such as an executive officer, director or large shareholder, in a relationship of control with the issuer of securities. Affiliates were required to abide by certain rules in selling stock. One such rule, contained in Rule 144 of Section 5 of the Securities Act of 1933 (the "Securities Act"), was that an affiliate could not sell more than one percent of the relevant class of the company's outstanding shares in a 90-day period. A person who owned or controlled 10 percent or more of a company's stock was commonly understood as being an affiliate of the company.

17.     The term "nominee" in the securities fraud context referred to a person or firm into whose name securities or other properties were transferred in order to facilitate transactions, while concealing the true identity of the actual owner. A "nominee account" was a type of account that held shares belonging to clients in the name of, for example, another individual or entity. The use of nominees and nominee accounts was designed to conceal the true ownership interest of the customer.

18.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies that have a low market capitalization. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

19.     A "pump and dump" scheme was a scheme in which a group of individuals who controlled the free trading of allegedly unrestricted shares, also referred to as the

5

"float," of a microcap company fraudulently inflated the share price and trading volume of the targeted public company through, inter alia, wash and matched trades, press releases and paid stock promotions. When the target company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain.

20.     Wash trades were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership. For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of Company A through Broker B. Matched trades were similar to wash trades but involved a related third person or party who placed one side of the trade. For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker. Both wash trades and matched trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

21.     A limit order was a direction given to a bank or broker to buy or sell a security or commodity at a specified price or better during a specified time period.

22.     A small lot transaction was a purchase or sale of a security in a small quantity.

III.     The Defendants and Relevant Co-Conspirators

23.     The defendant JEFFREY CHARTIER was the President of NWMH and a member of the boards of directors of both NWMH and CESX. CHARTIER and the defendant STEPHANIE LEE together incorporated SCM. CHARTIER was a co-signatory on the SCM

6

Brokerage Account, which account he and LEE opened together in or about December 2013.
CHARTIER also was a co-signatory, together with LEE, on more than one of SCM's bank
accounts. CHARTIER was also formerly a registered broker-dealer.

24.     The defendant STEPHANIE LEE was an owner and principal of SCM and
Type A Partners. LEE incorporated Type A Partners in approximately September 2013. LEE
was the sole signatory on one of the Type A Partners Brokerage Accounts and a Type A Partners
bank account, and was a co-signatory on the SCM Brokerage Account together with
CHARTIER. LEE was a co-signatory, together with CHARTIER, on more than one of SCM's
bank accounts, and was the sole signatory on at least one Type A Partners bank account. LEE
was identified as the investor contact for CESX and NWMH. LEE was also formerly a
registered broker-dealer.

25.     The defendant LAWRENCE ISEN was a professional marketer and
controlled Marketbyte. ISEN was also formerly a registered broker-dealer, but was barred from
working in the broker-dealer industry in or about 1995.

26.     The defendant MICHAEL WATTS was a professional marketer and
controlled Geoserve. WATTS's brother was the Chief Executive Officer of HECC. WATTS
was also formerly a registered broker-dealer.

27.     The defendant ROBERT GLECKMAN was formerly a registered broker-
dealer and controlled Snap or Tap Productions.

28.     The defendant ERIK MATZ worked in a management role at the Boiler
Room. He was formerly a registered broker-dealer, but was barred from working in the broker-
dealer industry in or about 2007.

29.     The defendant RONALD HARDY worked in a management role at the
Boiler Room. HARDY also controlled multiple companies including PTP Construction Corp.,
Revolving Ventures LLC, RKRG Inc., Terryville Systems Inc. and Gabron Transport Corp.
HARDY was also formerly a registered broker-dealer, but was barred from working in the
broker-dealer industry in or about 2009.

30.     The defendant BRIAN HEEPKE worked as a cold-caller for the Boiler
Room. HEEPKE identified himself to one or more victim investors using the false name "Brian
Targis" while employed at Boiler Room.

31.     The defendant DENNIS VERDEROSA worked as a cold-caller for the
Boiler Room.

32.     The defendant EMIN L. COHEN worked as a cold-caller for the Boiler
Room. COHEN identified himself to one or more victim investors using the false name "Ian
Grant" while employed at the Boiler Room.

33.     The defendant ANTHONY VASSALLO incorporated and controlled
ESR. VASSALLO was a co-signatory on two brokerage accounts in the name of ESR.
VASSALLO also received payments from the Boiler Room. VASSALLO was also formerly a
registered broker-dealer, but was barred from working in the broker-dealer industry in or about
1995.

34.     The defendant PAUL EWER worked as a cold-caller for the Boiler Room.
EWER was previously associated with a registered broker-dealer, and previously held licenses to
trade securities.

35.     The defendant MCARTHUR JEAN worked as a cold-caller for the Boiler
Room. JEAN identified himself to one or more victim investors using the false name "John

8

McArthur" while employed at the Boiler Room. JEAN was previously associated with a number of registered broker-dealers and previously held licenses to trade securities.

36. The defendant ASHLEY ANTOS worked as a cold-caller for the Boiler Room.

37. The defendant ROBERT GILBERT incorporated ESR together with the defendant ANTHONY VASSALLO. GILBERT worked as an employee of ESR, and was a co-signatory on at least one ESR bank account together with VASSALLO. GILBERT stopped working for ESR in or about 2014 and thereafter founded AIP, which he controlled. GILBERT was also formerly a registered broker-dealer, but was suspended from working in the broker-dealer industry for the period from approximately 1996 through 1999.

38. The defendant SERGIO RAMIREZ worked as a cold-caller for the Boiler Room.

39. Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was a close relative of the defendant ERIK MATZ. MATZ used accounts in Co-Conspirator 1's name, including but not limited to two brokerage accounts in Co-Conspirator 1's name (the "Co-Conspirator 1 Brokerage Accounts"), for which Co-Conspirator 1 was the sole signatory, to further the fraudulent stock manipulation scheme. MATZ also used an email address registered to Co-Conspirator 1, and put MATZ's own property, including a house, in Co-Conspirator 1's name instead of his own. Co-Conspirator 1 was identified as the "purchaser" in a stock purchase agreement dated on or about February 2, 2015, involving the purchase of approximately 50,000 NWMH shares from Type A Partners.

40. Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was also a close relative of the defendant ERIK MATZ. On or about September 21, 2015,

9

SCM entered into a NWMH stock purchase agreement with the Boiler Room, involving the sale of approximately 100,000 NWMH shares. LEE signed the agreement on behalf of the seller, SCM, and Co-Conspirator 2 signed the agreement on behalf of the purchaser, the Boiler Room, operating at that time under the name PTP. In addition, Co-Conspirator 2 filed the incorporation documents for PTP. Co-Conspirator 2 was the sole signatory for one of the Boiler Room's PTP Brokerage Accounts and was identified in the application for that account as the President of PTP.

41.  Co-Conspirator 3, an individual whose identity is known to the Grand Jury, worked as an employee of the Boiler Room. MATZ used a Boiler Room email address in Co-Conspirator 3's name to communicate with one or more defendants and co-conspirators. Co-Conspirator 3 was the sole signatory for a Boiler Room brokerage account held in the name Dacona Financial (the "Dacona Brokerage Account").

42.  Co-Conspirator 4, an individual whose identity is known to the Grand Jury, worked as an employee of the Boiler Room.

43.  Co-Conspirator 5, an individual whose identity is known to the Grand Jury, was the sole signatory for two brokerage accounts in Co-Conspirator 5's name (the "Co-Conspirator 5 Brokerage Accounts"). Co-Conspirator 5 opened one of those brokerage accounts during a period of time in which she had repeated telephone contact with the defendant RONALD HARDY. Co-Conspirator 5 transferred thousands of dollars from her bank accounts into the Co-Conspirator 5 Brokerage Accounts. The brokerage firm that serviced one of the Co-Conspirator 5 Brokerage Accounts closed that account in or about December 2015. Co-Conspirator 5 was not formally associated with the Boiler Room.

10

44. Co-Conspirator 6, an individual whose identity is known to the Grand Jury, was the sole signatory for a brokerage account in Co-Conspirator 6's name (the "Co-Conspirator 6 Brokerage Account"). Co-Conspirator 6 transferred thousands of dollars from her bank accounts into the Co-Conspirator 6 Brokerage Account. Co-Conspirator 6 was not formally associated with the Boiler Room.

45. Co-Conspirator 7, an individual whose identity is known to the Grand Jury, worked as a secretary for the Boiler Room and answered the Boiler Room's incoming telephone calls. Co-Conspirator 7 also was identified in an account application as the President of Boiler Room when it operated under the name Trade Masters Pro. Co-Conspirator 7 was the sole signatory for a Boiler Room brokerage account held in the name Trade Masters Pro.

46. Co-Conspirator 8, an individual whose identity is known to the Grand Jury, was an attorney residing and practicing in Canada who facilitated trading in ICEIF stock.

47. Co-Conspirator 9, an individual whose identity is known to the Grand Jury, controlled a Bahamian company that traded in ICEIF stock ("Company 1"), the identity of which is known to the Grand Jury.

IV.    The Fraudulent Schemes

48. In or about and between January 2014 and July 2017, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN, MICHAEL WATTS, ROBERT GLECKMAN, ERIK MATZ, RONALD HARDY, BRIAN HEEPKE, DENNIS VERDEROSA, EMIN L. COHEN, ANTHONY VASSALLO, PAUL EWER, MCARTHUR JEAN, ASHLEY ANTOS, ROBERT GILBERT and SERGIO RAMIREZ, together with others, engaged in a scheme to defraud investors and potential investors in, among other companies, one or more of the following publicly traded companies: NWMH, CESX, GRLD, HECC and ICEIF

11

(collectively, the "Manipulated Public Companies"), by artificially controlling the price and volume of traded shares in the Manipulated Public Companies through, inter alia: (a) artificially generating price movements and trading volume in the shares; and (b) material misrepresentations and omissions in their communications with victim investors about the stock of the Manipulated Public Companies, relating to, among other things, the advisability of purchasing such stock. To execute this scheme, the defendants, inter alia, fraudulently concealed their control of shares of the Manipulated Public Companies that were held in brokerage accounts in the names of other individuals or entities. In addition, in or about and between 2014 and 2017, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN, ERIK MATZ and RONALD HARDY, together with others, engaged in a scheme to launder approximately $14,714,493 in proceeds of the foregoing stock manipulation schemes.

A.    The Stock Manipulation Scheme

49.    In order to carry out the fraudulent stock manipulation scheme described below, employees of the Boiler Room obtained shares from insiders at the Manipulated Public Companies, including the defendants JEFFREY CHARTIER, STEPHANIE LEE, MICHAEL WATTS and ROBERT GLECKMAN, at below-market prices through stock purchase and consulting agreements.

50.    Once employees of the Boiler Room obtained shares in the Manipulated Public Companies, the defendants engaged in manipulative trading patterns including wash trades and matched trades to drive up the price of the shares, while aggressively and repeatedly calling and emailing victim investors – many of whom were senior citizens – to purchase shares in the Manipulated Public Companies. When victim investors indicated a willingness to purchase a recommended stock, the defendants and their co-conspirators at the Boiler Room

12

called the victim investors repeatedly, pressured them to follow through with their purchases and directed them to log into their trading accounts while still on the telephone to place purchase orders for the relevant stock. Many of the victim investors ultimately purchased stock in more than one of the Manipulated Public Companies. In some cases, the Boiler Room also charged the victim investors for "subscriptions" to receive stock recommendations.

51. The defendants did not disclose to the victim investors that, contemporaneously with or shortly after their recommendation to the victim investors of the stocks of the Manipulated Public Companies, the defendants and their co-conspirators sold their own shares in the same companies. The victim investors therefore were left with the false and misleading impression that the stocks of the Manipulated Public Companies were sound investments in which the defendants and their co-conspirators themselves firmly believed.

52. The defendants' deceptive practices included using false names or the names of co-conspirators instead of their true names during their communications with victim investors. The defendants ERIK MATZ, BRIAN HEEPKE, EMIN L. COHEN and MCARTHUR JEAN most frequently employed those tactics by providing false names to victim investors and by using email addresses in other individuals' names when communicating with victim investors.

53. In addition, the defendants directed and controlled trading in shares of the Manipulated Public Companies in brokerage accounts with names that were not associated with themselves or the Boiler Room, including the names of Co-Conspirator 1, Co-Conspirator 5 and Co-Conspirator 6. Such trading, which included matching trades of both victim investors and co-conspirators as part of the scheme to manipulate the stock of the Manipulated Public Companies, therefore appeared not to be linked to the defendants or the Boiler Room.

13

(i)     The Manipulation of NWMH Stock

54.     In or about and between December 2014 and February 2016, the

defendants JEFFREY CHARTIER, STEPHANIE LEE, ERIK MATZ, RONALD HARDY,

BRIAN HEEPKE, DENNIS VERDEROSA, EMIN L. COHEN, PAUL EWER and ASHLEY

ANTOS (collectively, the "NWMH Defendants"), together with others, engaged in a pump and

dump scheme relating to NWMH stock. The NWMH Defendants artificially generated increased

trading volume in NWMH shares and an increased NWMH share price, including by convincing

victim investors to purchase thousands of the shares at inflated prices. Ultimately, the NWMH

Defendants profited from that manipulative trading in NWMH shares when they and their co-

conspirators sold substantial amounts of the shares at the inflated prices that their fraudulent

conduct had generated.

55.     The NWMH pump and dump scheme involved periods of concentrated

matched trading of NWMH shares by the NWMH Defendants, together with others. For

example, in or about and between February 2015 and May 2015, the NWMH Defendants

executed trades of large amounts of NWMH shares out of the Co-Conspirator 1 Brokerage

Accounts and the Type A Partners Brokerage Accounts. As a result of such matched trading in

that time period, the NWMH share price increased from approximately $1.00 to approximately

$1.98.

56.     The NWMH Defendants caused the Co-Conspirator 1 Brokerage Accounts

to purchase and sell shares of NWMH almost daily in or about and between February 2015 and

May 2015, in multiple small lot transactions using limit orders and matched and wash trades.

The brokerage accounts on the other sides of the foregoing matched trades were generally in the

names of victim investors, whose trades the NWMH defendants and their co-conspirators

14

induced and directed, and in the names of co-conspirators, including Co-Conspirator 5. For example, on or about March 23, 2015, a matched trade of NWMH was executed using brokerage accounts of Co-Conspirator 1 and Co-Conspirator 5. At approximately 2:15 p.m. that day, one of the Co-Conspirator 1 Brokerage Accounts sold approximately 4,500 NWMH shares at a price of approximately $1.62 per share and one of the Co-Conspirator 5 Brokerage Accounts purchased approximately 4,500 NWMH shares at the same price.

57.     The NWMH Defendants also used a cold-call campaign to fraudulently increase the price of NWMH stock. For example, using more than one landline telephone number registered to the Boiler Room, the NWMH Defendants and their co-conspirators called at least two different victim investors on or about March 25, 2015 ("Investor 1" and "Investor 2," respectively), individuals whose identities are known to the Grand Jury, and minutes later, Investor 1 and Investor 2 each purchased thousands of shares of NWMH at prices of between approximately $1.64 and $1.67 per share. The same day, the NWMH Defendants caused brokerage accounts in the names of Type A Partners and the Boiler Room to sell approximately tens of thousands of NWMH shares.

58.     Later that year, in or about and between October 2015 and December 2015, the NWMH Defendants, together with others, repeated their pattern of concentrated matched trading in NWMH shares. After the NWMH Defendants, together with others, sold substantial amounts of the NWMH shares they controlled, the NWMH share price fell to approximately $0.26 in or about February 2016.

59.     Prior to the foregoing period of matched trading, on or about September 21, 2015, SCM entered into an agreement with the Boiler Room (then operating as PTP), for the

15

sale of 100,000 NWMH shares. LEE signed the agreement on behalf of the seller, SCM, and Co-Conspirator 2 signed the agreement on behalf of the purchaser, the Boiler Room.

60.     On or about October 1, 2015, SCM wired approximately $10,000 to NWMH's investor relations firm ("Investor Relations Firm 1"), an entity the identity of which is known to the Grand Jury. On or about November 16, 2015, NWMH issued a press release announcing its third quarter financial results and providing an update on its business. That same day, a landline telephone number registered to the Boiler Room called a victim investor ("Investor 3"), an individual whose identity is known to the Grand Jury. Nearly contemporaneously, Investor 3 purchased approximately 21,500 NWMH shares at a price of approximately $1.24 per share. Within an hour of that transaction, the NWMH Defendants caused brokerage accounts of Co-Conspirator 1 and Co-Conspirator 5 to execute a matched trade in which the Co-Conspirator 5 brokerage account purchased approximately 2,900 NWMH shares at a price of approximately $1.27 per share, and a Co-Conspirator 1 Brokerage Account sold the same number of NWMH shares at the same price. Later that day, a PTP brokerage account sold approximately 100,000 NWMH shares at a price of approximately $1.26 per share.

61.     The NWMH Defendants were in frequent telephone contact with each other at or near the times of the execution of matched trades connected with the manipulation of NWMH's stock. For example, on or about October 16, 2015, a victim investor ("Investor 4"), an individual whose identity is known to the Grand Jury, purchased approximately 5,000 NMWH shares and, approximately one minute later, the SCM Brokerage Account sold approximately 5,000 NMWH shares. Within approximately one hour before that trade was executed, the defendant ERIK MATZ's cellular telephone (the "MATZ Telephone") received approximately four text messages from the defendant STEPHANIE LEE's cellular telephone (the "LEE

Telephone"). Approximately two minutes after the trade, the MATZ Telephone received another text message from the LEE Telephone, and later that day, the MATZ Telephone received a total of approximately five additional text messages from the LEE Telephone.

62.     In addition, on or about October 20, 2015, an investor ("Investor 5"), an individual whose identity is known to the Grand Jury, purchased approximately 4,600 NWMH shares. The SCM Brokerage Account sold approximately 4,600 NWMH shares approximately seconds later. Within the approximately two hours preceding those trades, the MATZ Telephone sent a total of four text messages to the LEE Telephone and received two text messages from the LEE Telephone.

63.     Further, on or about December 10, 2015, the NWMH Defendants executed approximately five matched trades in NWMH stock, all with the same seller. The purchaser in those trades was either a Co-Conspirator 1 Brokerage Account or a Type A Partners Brokerage Account. Also on or about December 10, 2015, the MATZ Telephone and the LEE Telephone exchanged a total of seven text messages within an approximately three-minute period, just minutes before the string of matched trades was executed.

64.     As a result of the NWMH stock manipulation, the NWMH Defendants made substantial gross trading profits in personal and corporate accounts they controlled, including approximately $519,356 in the Dacona Brokerage Account, approximately $428,462 in PTP Brokerage Accounts, approximately $967,326 in the Co-Conspirator 1 Brokerage Accounts, approximately $2,063,217 in the Type A Partners Brokerage Accounts, approximately $1,099,951 in the SCM Brokerage Account, and approximately $242,788 in the defendant JEFFREY CHARTIER's brokerage accounts.

17

(ii)    The Manipulation of CESX Stock

65.    In or about and between January 2014 and May 2014, the defendants

JEFFREY CHARTIER, STEPHANIE LEE and ANTHONY VASSALLO, together with others,

engaged in a pump and dump scheme relating to CESX stock. Later, in or about and between

June 2015 and August 2015, the defendants JEFFREY CHARTIER, STEPHANIE LEE, ERIK

MATZ, RONALD HARDY and DENNIS VERDEROSA, together with others, engaged in

another pump and dump scheme relating to CESX stock. CHARTIER, LEE, VASSALLO,

MATZ, HARDY and VERDEROSA (collectively, the "CESX Defendants") artificially

generated increased trading volume in CESX shares and a spike in CESX's share price during

the pump and dump schemes in which they engaged, including by convincing victim investors to

purchase thousands of CESX shares at inflated prices. Ultimately, the CESX Defendants

profited from the manipulative trading in CESX shares when they and their co-conspirators sold

substantial amounts of the shares at the inflated prices that their fraudulent conduct had

generated.

(a)    The 2014 CESX Stock Manipulation

66.    The first pump and dump of CESX stock occurred in or about and

between January 2014 and May 2014, and involved concentrated matched trading in CESX

shares by CHARTIER, LEE and VASSALLO, together with others. As a result of such matched

trading in that time period, the CESX share price increased to a high of approximately $2.71.

18

67.     In or about and between January and March 2014, SCM and Type A

Partners deposited approximately 623,000 shares of CESX into brokerage accounts pursuant to

stock purchase agreements.

68.     On or about March 25, 2014, LEE and VASSALLO executed an

agreement in their capacities as Chief Executive Officers of Type A Partners and ESR,

respectively, that provided, in sum and substance, that ESR would raise investor awareness of

CESX and would promote CESX as a recommended stock from April 1, 2014 until May 15,

2014, or until ESR deemed CESX stock no longer beneficial to own, whichever occurred first.

The agreement also stated that in consideration for the foregoing services, Type A Partners

would deliver to ESR 250,000 shares of CESX, without any restriction on the transfer of those

shares.  Following that agreement, in or about April 2014, ESR deposited approximately 225,000

CESX shares into the ESR Brokerage Account.

69.     Beginning on or about March 26, 2014 and continuing through

approximately May 2014, victim investors purchased CESX shares while the ESR and Type A

Partners Brokerage Accounts repeatedly sold CESX shares. Ultimately, CHARTIER, LEE and

VASSALLO profited from the pump and dump by selling and directing the sale of CESX shares

from the corporate and personal brokerage accounts they controlled.

                (b)      The 2015 CESX Stock Manipulation

70.     The second pump and dump of CESX stock occurred in or about and

between June 2015 and October 2015, and involved concentrated matched trading in CESX

shares by CHARTIER, LEE, MATZ, HARDY and VERDEROSA, together with others. As a

result of such matched trading in that time period, the CESX share price increased to a high of approximately $1.01.

71.     In or about June 2015, LEE deposited 650,000 CESX shares through stock purchase agreements into one of the Type A Partners Brokerage Accounts. In or about August 2015, LEE sold a total of approximately 150,000 of those shares to Co-Conspirator 1 pursuant to stock purchase agreements. On or about August 24, 2015, CESX issued a press release announcing a new contract.

72.     Two days later, on or about August 26, 2015, Type A Partners wired approximately $15,000 to a PTP bank account and approximately $29,000 to a bank account in the name of Co-Conspirator 1. The same day, the CESX Defendants conducted manipulative trading in CESX stock. Specifically, one of the Co-Conspirator 1 Brokerage Accounts purchased a total of approximately 26,100 CESX shares at a price of between approximately $0.79 and $0.98 per share, and one of the Co-Conspirator 5 Brokerage Accounts purchased approximately 6,900 CESX shares at a price of between approximately $0.80 and $0.83 per share.

73.     Also on or about August 26, 2015, a landline telephone number registered to the Boiler Room made telephone calls to victim investors that coincided with or closely preceded the victim investors' placement of purchase orders in CESX stock. For example, the telephone line called two different victim investors ("Investor 6" and "Investor 7," respectively), individuals whose identities are known to the Grand Jury, in separate calls; just minutes after those calls, Investor 6 purchased approximately 60,000 CESX shares at a price of between approximately $0.84 and $0.85 per share, and Investor 7 purchased approximately 30,000 CESX shares at a price of approximately $0.83 per share.

74. Later that same day, brokerage accounts in the names of Co-Conspirator 1, Co-Conspirator 5, Type A Partners and the Boiler Room, respectively, sold a total of approximately more than 100,000 CESX shares at a profit.

75. From approximately August 25, 2015 to August 26, 2015, the time period described above, CESX daily trading volume increased dramatically from approximately 796 shares to approximately 383,977 shares.

76. As a result of the CESX stock manipulation, the CESX Defendants made substantial gross trading profits in personal and corporate accounts they controlled, including approximately $469,935 in the Dacona Brokerage Account, approximately $67,595 in PTP Brokerage Accounts, approximately $228,852 in Co-Conspirator 1 Brokerage Accounts, approximately $1,014,765 in Type A Partners Brokerage Accounts, approximately $386,765 in the SCM Brokerage Account, approximately $35,089 in the defendant LEE's personal brokerage accounts, and approximately $494,406 in ESR Brokerage Accounts.

(iii)    The Manipulation of GRLD Stock

77. In or about and between September 2014 and December 2015, the defendants ERIK MATZ, RONALD HARDY, BRIAN HEEPKE, DENNIS VERDEROSA and EMIN L. COHEN (collectively, the "GRLD Defendants"), together with others, engaged in a pump and dump scheme relating to GRLD stock. The GRLD Defendants artificially generated increased trading volume in GRLD shares and an increased GRLD share price, including by convincing victim investors to purchase thousands of the shares at inflated prices. Ultimately, the GRLD Defendants profited from that manipulative trading in GRLD shares when they and

21

their co-conspirators sold substantial amounts of the shares at the inflated prices that their
fraudulent conduct had generated.

78.    The GRLD pump and dump scheme involved concentrated matched
trading in GRLD shares by the GRLD Defendants, together with others, including during the
period from approximately February 2015 through December 2015. As a result of such matched
trading in that time period, the GRLD share price increased to a high of approximately $1.47.

79.    On or about September 15, 2014, GRLD's investor relations firm
("Investor Relations Firm 2"), an entity whose identity is known to the Grand Jury, wired
approximately $25,000 to a Boiler Room bank account. On or about February 25, 2015, GRLD
issued a press release noting that its licensing partner had commenced an "Indian Gaming
Strategy," which included the provision of GRLD goods and services to casinos and Native
American reservations. On or about March 4, 2015, an entity whose identity is known to the
Grand Jury ("Company 2") entered into an agreement with the Boiler Room in which the Boiler
Room agreed, in sum and substance, to provide marketing services relating to GRLD in
exchange for GRLD shares. On or about March 4, 2015, Company 2 entered into another
agreement with the Boiler Room in which the Boiler Room agreed to provide consulting services
relating to GRLD in exchange for 20,000 shares of GRLD and $25,000 per month.

80.    On or about May 15, 2015, GRLD filed a Form 10-Q with the SEC
announcing that it had obtained approval to create a wholly-owned subsidiary, Grilled Cheese
Military, Inc., for the purpose of operating on military bases. Later, between approximately June
2015 and November 2015, PTP entered into approximately 12 stock purchase agreements with
Company 2. Pursuant to those agreements, PTP purportedly purchased approximately 1,030,000
GRLD shares for approximately $213,100.

22

81. In or about and between July 2015 and December 2015, the GRLD Defendants fraudulently increased the share price of GRLD by, inter alia, engaging in manipulative trading of GRLD shares and a cold-call campaign. During that time period, brokerage accounts in the names of Co-Conspirator 1 and Co-Conspirator 5 purchased and sold GRLD shares in multiple small lot transactions.

82. On or about August 12, 2015, GRLD filed a Form 8-K with the SEC announcing its agreement with the company Soupman, Inc., which granted GRLD the exclusive right to establish and operate an independent business that sold and serviced "The Original Soupman" franchises. Shortly thereafter, on or about August 31, 2015, more matched trades in GRLD stock were executed by or at the direction of the GRLD Defendants, with Investor 4 and Investor 6 as purchasers, and Type A Partners Brokerage Accounts as sellers. Close in time to the foregoing trades, the MATZ Telephone had telephone contact with the LEE Telephone and the defendant DENNIS VERDEROSA's cellular telephone (the "VERDEROSA Telephone"), among others.

83. Further, on or about September 10, 2015, two landline telephone numbers registered to the Boiler Room had telephone contact with Investor 6 and Investor 7, and, shortly thereafter, Investor 6 and Investor 7 respectively purchased thousands of GRLD shares at prices of approximately $1.42 to $1.43 per share. That same day, the Boiler Room's brokerage accounts sold approximately 56,500 GRLD shares at prices of approximately $1.42 to $1.47 per share.

84. More recently, in or about and between January 2016 and May 2016, GRLD changed its name to American Patriot Brands and made changes to the company's management team. In addition, in a filing with the SEC on March 11, 2016, GRLD stated that it

23

had entered into an agreement in February 2016 with PTP in which PTP was to perform investor relations services for GRLD. PTP purportedly received approximately 600,000 GRLD shares for those services. In addition, GRLD stated in a filing with the SEC that in approximately March 2016, GRLD extended the agreement and, pursuant to its terms, PTP was to receive approximately 400,000 additional GRLD shares. Moreover, the "investor contact" listed on American Patriot Brands' website as of approximately September 15, 2016 was "Eric Matzer, Power Traders."

85.     As a result of the GRLD stock manipulation, the GRLD Defendants made substantial gross trading profits in personal and corporate accounts they controlled, including approximately $43,832 in the Dacona Brokerage Account, approximately $452,386 in PTP Brokerage Accounts, and approximately $2,224 in Type A Partners Brokerage Accounts.

(iv)     The Manipulation of HECC Stock

86.     In or about and between August 2014 and January 2016, the defendants LAWRENCE ISEN, MICHAEL WATTS, ROBERT GLECKMAN, ERIK MATZ, RONALD HARDY, DENNIS VERDEROSA, EMIN L. COHEN, PAUL EWER, MCARTHUR JEAN and ROBERT GILBERT (collectively, the "HECC Defendants"), together with others, engaged in a pump and dump scheme relating to HECC stock. The HECC Defendants artificially generated increased trading volume in HECC shares and an increased HECC share price, including by convincing victim investors to purchase thousands of the shares at inflated prices. Ultimately, the HECC Defendants profited from that manipulative trading in HECC shares when they and

their co-conspirators sold substantial amounts of the shares at the inflated prices that their
fraudulent conduct had generated.

87.     The HECC pump and dump involved concentrated matched trading in
HECC shares by the HECC Defendants, together with others, including during the period from
approximately November 2015 through January 2016. As a result of such matched trading in
that time period, the HECC share price increased to a high of approximately $2.53.

88.     In or about 2014, approximately one year before the pump and dump, the
Boiler Room acquired HECC shares through Geoserve, controlled by WATTS, and Snap or Tap
Productions, controlled by GLECKMAN. In or about and between August 2014 and December
2015, the Boiler Room (then operating as PTP) entered into at least four different consulting
agreements with Geoserve – which had acquired shares through consulting agreements with
HECC – in exchange for cash and HECC shares. PTP also purchased HECC shares at a below-
market price from Snap or Tap Productions, which had acquired shares directly from HECC.
For example, on or about June 12, 2015, the PTP Brokerage Account purchased approximately
50,000 shares of HECC for approximately $500 from GLECKMAN. ISEN, who controlled
Marketbyte, facilitated the share transfers between Geoserve, GLECKMAN and the Boiler
Room by, inter alia, providing supporting documentation to a brokerage firm
("Brokerage Firm 1"), an entity the identity of which is known to the Grand Jury, to ensure the
successful deposit of HECC shares into a Boiler Room brokerage account.

89.     GLECKMAN and Geoserve made payments to the Boiler Room prior to,
during, and after the pump and dump. In or about and between August 13, 2015 and October 19,
2015, GLECKMAN wired $349,500 to a PTP bank account, and in or about and between

25

November 2015 and January 2016, Geoserve wired approximately $564,148 to that bank account.

90.    Further, in or about and between November 2015 and January 2016, the brokerage accounts of Co-Conspirator 1 and Co-Conspirator 5 engaged in matched and wash trades to manipulate HECC's share price. For example, on or about the morning of November 24, 2015, a landline telephone number registered to the Boiler Room called Investor 3. That same morning, brokerage accounts in the names of Co-Conspirator 1 and Co-Conspirator 5 purchased thousands of HECC shares and sold thousands of HECC shares for a slightly higher share price. Around the same time, Investor 3 purchased approximately 55,000 HECC shares. HECC's share price increased following such trading. On or about November 25, 2015 and November 27, 2015, the foregoing pattern of communication with Investor 3 and trading in HECC shares was repeated at even higher share prices.

91.    In or about and between July 2015 and January 2016, Investor 3, Investor 6 and Investor 7, among others, purchased shares from AIP, controlled by GILBERT. For example, on or about July 14, 2015, AIP sold approximately 1,100 HECC shares to Investor 7; on or about July 16, 2015, AIP sold approximately 2,800 HECC shares to Investor 6; and on or about July 21, 2015, AIP sold approximately more than 1,000 HECC shares to Investor 3.

92.    In addition, Marketbyte, controlled by ISEN, and WATTS both sold HECC shares directly to victim investors in or about and between July 2015 and January 2016. For example, Marketbyte sold hundreds of HECC shares directly to Investor 6 for $1.30 per share on July 21, 2015, and hundreds of HECC shares directly to other victim investors on August 6, 2015. Likewise, on October 30, 2015, November 25, 2015, and December 14, 2015,

WATTS sold thousands of HECC shares to victim investors. And on December 24, 2015 and January 6, 2016, WATTS sold thousands of HECC shares to Investor 3.

93.     As a result of the HECC stock manipulation, the HECC Defendants made substantial gross trading profits in personal and corporate accounts they controlled, including a total of approximately $884,018 in WATTS' personal brokerage accounts, approximately $100,154 in ISEN's personal brokerage accounts, approximately $283,620 in Marketbyte brokerage accounts, approximately $13,813 in brokerage accounts controlled by the MATZ, approximately $107,679 in the Dacona Brokerage Account, approximately $70,602 in Boiler Room Brokerage Accounts, approximately $30,096 in the AIP Brokerage Account, approximately $489,309 in GLECKMAN's personal brokerage accounts, and approximately $210,724 in the Snap or Tap Productions Brokerage Account.

(v)     The Manipulation of ICEIF Stock

94.     In or about and between February 2016 and July 2016, the defendants LAWRENCE ISEN, ERIK MATZ, RONALD HARDY, BRIAN HEEPKE, EMIN L. COHEN, PAUL EWER, MCARTHUR JEAN, ASHLEY ANTOS and SERGIO RAMIREZ (collectively, the "ICEIF Defendants"), together with others, engaged in a pump and dump scheme relating to ICEIF stock. The ICEIF Defendants artificially generated increased trading volume in ICEIF shares and an increased ICEIF share price, including by convincing victim investors to purchase thousands of the shares at inflated prices. Ultimately, the ICEIF Defendants profited from that manipulative trading in ICEIF shares when they and their co-conspirators sold substantial amounts of the shares at the inflated prices that their fraudulent conduct had generated.

95.     The ICEIF pump and dump involved concentrated matched trading in ICEIF shares by the ICEIF Defendants, together with others, including during the period from

approximately February 2016 through July 2016. The trading volume in ICEIF in the period of approximately March 2016 through July 2016 was dramatically higher than it had been earlier in 2016. In addition, approximately six victim investors purchased a total of approximately 127,000 ICEIF shares on or about and between March 7, 2016 and March 29, 2016 for approximately $200,000. As a result of such matched trading in that time period, the ICEIF share price increased to a high of approximately $2.29.

96.     On or about March 2, 2016, Co-Conspirator 8 emailed a brokerage firm ("Brokerage Firm 2"), an entity the identity of which is known to the Grand Jury, requesting that ISEN be given trading authority on accounts associated with Co-Conspirator 8. On or about March 6, 2016, ISEN and Co-Conspirator 8 had telephone contact and, the same day, Co-Conspirator 8 emailed Brokerage Firm 2 requesting the placement of open ICEIF orders to commence on March 7, 2016.

97.     On or about March 7, 2016, ISEN had repeated telephone contact with more than one landline telephone number registered to the Boiler Room; with ICEIF's Chief Executive Officer (the "ICEIF Company Insider"), an individual whose identity is known to the Grand Jury; and also with Co-Conspirator 8. That same day, the PTP Brokerage Account, victim investors, and brokerage accounts associated with Co-Conspirator 8 at Brokerage Firm 2 began trading in ICEIF stock. On or about March 8, 2016, the ICEIF Defendants matched trades in ICEIF using the brokerage accounts of Co-Conspirators 1 and 5, and MATZ and Co-Conspirator 8 had telephone contact.

98.     On or about March 16, 2016, Co-Conspirator 8 began wiring money to a Marketbyte bank account controlled by ISEN, and the next day, that Marketbyte bank account began transferring large amounts of money to PTP's bank accounts. On or about April 7, 2016,

28

ISEN had repeated telephone contact with the ICEIF Company Insider, and telephone numbers associated with Co-Conspirator 9 and a brokerage firm based in Malta ("Brokerage Firm 3"), an entity the identity of which is known to the Grand Jury. In the days that followed, Brokerage Firm 3 sold ICEIF shares directly to victim investors.

99.     On or about May 2, 2016, ISEN emailed MATZ a spreadsheet that detailed trading data related to PTP's promotion of ICEIF, including the co-conspirators' profits from trades with certain victim investors.

100.    In approximately July 2016, a victim investor ("Investor 8"), an individual whose identity is known to the Grand Jury, spoke to an individual at the Boiler Room who introduced himself as "Ian Grant," a false name used by COHEN. COHEN strongly recommended that Investor 8 purchase ICEIF shares. COHEN assisted Investor 8 with completing his side of the trade. According to trading data, Investor 8's ICEIF purchase order for approximately 1,600 shares was filled pursuant to a matched trade.

101.    As a result of the ICEIF stock manipulation, the ICEIF Defendants made substantial gross trading profits in personal and corporate accounts they controlled, including approximately $12,408 in Co-Conspirator 1's Brokerage Accounts and approximately $1,039,300 transferred from Company 1's bank account to accounts controlled by ICEIF Defendants.

B.      The Scheme to Launder Proceeds of the Stock Manipulation Scheme

102.    In or about and between 2014 and 2017, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN, ERIK MATZ and RONALD HARDY, together with others, engaged in a scheme to launder approximately $14,714,493 in proceeds of the fraudulent schemes to manipulate the share prices of NWMH, CESX, GRLD, HECC and

29

ICEIF. CHARTIER, LEE, ISEN, MATZ and HARDY, together with others, laundered proceeds

of their pump and dump schemes involving the Manipulated Public Companies by transferring

such proceeds from brokerage accounts that they and their co-conspirators controlled through,

inter alia, bank accounts in the names of companies controlled by the co-conspirators and other

individuals, including Co-Conspirator 1, Co-Conspirator 5 and Co-Conspirator 6, or by

generating invoices to lend the appearance of legitimacy to the transactions.

           (i)      The Defendants' Transfers of Funds Through Multiple Accounts

        103.    In or about and between January 2014 and July 2017, LEE frequently

transferred large amounts of money from the SCM Brokerage Account, for which she and

CHARTIER were signatories, to bank accounts registered to, inter alia, SCM and Type A

Partners. LEE thereafter transferred those funds or portions thereof to bank accounts controlled

by CHARTIER, LEE and MATZ, including bank accounts in the name of Co-Conspirator 1,

from which accounts the funds were withdrawn and used to pay for, inter alia, one or more

vehicles purchased by LEE, mortgage payments for a home in the name of Co-Conspirator 1, an

additional home in the name of Co-Conspirator 1 but inhabited by MATZ, and living expenses of

CHARTIER and LEE, respectively. CHARTIER, LEE and MATZ knew that such funds were

the proceeds of their and their co-conspirators' pump and dump schemes involving the

Manipulated Public Companies.

           (ii)     The Defendants' Use of Invoices

        104.    In or about and between January 2014 and July 2017, ISEN frequently

received large amounts of money from Company 1 and Co-Conspirator 8 in a bank account in

the name of Marketbyte. ISEN thereafter transferred portions of those funds from the

Marketbyte account to bank accounts controlled by his co-conspirators, while keeping the

remainder of the funds in the Marketbyte account. MATZ and HARDY emailed purported invoices to ISEN describing services performed by the Boiler Room for Marketbyte, in order to lend the appearance of legitimacy to the foregoing wire transfers. ISEN also transferred the remaining funds in the Marketbyte account, or portions thereof, to one or more bank accounts in ISEN's name, which funds ISEN used to pay for, inter alia, ISEN's mortgage and landscaping services for his home.

105.    MATZ and HARDY also transferred into other bank accounts, or withdrew as cash, funds from brokerage accounts used in furtherance of the stock manipulation scheme involving the Manipulated Public Companies, including brokerage accounts in the names of Dacona Financial, Power Traders Press, Trade Masters Pro and Co-Conspirator 1. MATZ and HARDY, together with their co-conspirators, including, inter alia, Co-Conspirator 5 and Co-Conspirator 6, then transferred such funds or portions thereof to brokerage and bank accounts in the names of, inter alia, Co-Conspirator 1, Co-Conspirator 5, Co-Conspirator 6 and entities controlled by HARDY, including, inter alia, Revolving Ventures LLC, RKRG Inc., PTP Construction Corp., Terryville Systems Inc. and Gabron Transport Corp. After transferring the funds or portions thereof through one or more of the foregoing accounts, MATZ and HARDY used such funds to make purchases including, in MATZ's case, a home in the name of Co-Conspirator 1 but inhabited by MATZ.

106.    ISEN, MATZ and HARDY knew that the foregoing funds were the proceeds of their and their co-conspirators' pump and dump schemes involving the Manipulated Public Companies.

31

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

107.     The allegations contained in paragraphs one through 106 are realleged and incorporated as though fully set forth in this paragraph.

108.     In or about and between January 2014 and July 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN, MICHAEL WATTS, ROBERT GLECKMAN, ERIK MATZ, RONALD HARDY, BRIAN HEEPKE, also known as "Brian Targis," DENNIS VERDEROSA, EMIN L. COHEN, also known as "Ian Grant," PAUL EWER, MCARTHUR JEAN, also known as "John McArthur," ASHLEY ANTOS, ROBERT GILBERT and SERGIO RAMIREZ, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in the Manipulated Public Companies, in connection with the purchase and sale of investments in the Manipulated Public Companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

109.    In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York and elsewhere, the defendants JEFFREY CHARTIER,

STEPHANIE LEE, LAWRENCE ISEN, MICHAEL WATTS, ROBERT GLECKMAN, ERIK

MATZ, RONALD HARDY, BRIAN HEEPKE, also known as "Brian Targis," DENNIS

VERDEROSA, EMIN L. COHEN, also known as "Ian Grant," PAUL EWER, MCARTHUR

JEAN, also known as "John McArthur," ASHLEY ANTOS, ROBERT GILBERT and SERGIO

RAMIREZ, together with others, did commit and cause to be committed, among others, the

following:

### OVERT ACTS

(a)    On or about November 17, 2014, ISEN sent an email to

GILBERT with the subject line: "Hydrocarb." The email stated: "Robert – great talking to you

today. Attached are some files on Hydrocarb for you to use." The email's attachments included

documents titled: "SeeThroughHECC" and "HEC-Investors-10.08.14."

(b)    On or about November 19, 2014, ISEN replied to GILBERT's

prior email and attached a scanned electronic copy of ISEN's bank account statement confirming

a wire transfer. The document stated, "Initiate Single Wire – Confirmation," identified the date

as November 19, 2014, and the wire amount as $25,000, and listed the debit account as "LLC

Marketbyte" and the beneficiary account as "Accredited Investor Preview."

(c)    On or about November 19, 2014, GILBERT sent an email to ISEN

stating: "Hi Larry, As promised, here is the signed contract for your review. Looking forward to

getting started." Attached to the email was a consulting agreement between GILBERT's

company AIP and WATTS' company Geoserve, pursuant to which AIP would provide

"specialized services" to Geoserve "with a focus on Hydrocarb Energy (HECC)," and Geoserve

33

agreed to compensate AIP with approximately 25,000 HECC shares of "restricted 144 stock" and approximately $25,000.

        (d)     On or about January 21, 2015, HARDY sent an email from a PTP email address with the subject "POWER TRADERS PRESS - EXAS, HECC FOLLOW UP" to a customer or potential customer: "As per our conversation, here's the reports on both HECC, and EXAS. If you decide to buy HECC I'd put a limit @ $1.54 to buy. Also EXAS anywhere below $26.25 is great in my opinion. Please just shoot me an email back letting me know what you pick up of these. Thanks, Happy trading. Ron Hardy."

        (e)     On or about January 29, 2015, GILBERT sent ISEN an email with the subject line: "WIRING INSTRUCTIONS," containing AIP's wire information and stating: "Hi Larry, Thanks and let's keep it going!!!!"

        (f)     In or about April 2015, after the second pump and dump of CESX, CHARTIER sold his ownership stake in SCM to LEE.

        (g)     On or about June 11, 2015, RAMIREZ sent an email to a potential Boiler Room subscriber from VERDEROSA's email address, stating: "I called you last week to explain how this program works but I guess you didnt realize you signed up for a 4 month TRIAL of our news letter. I know you get 30 calls a day from Brokers who just LOVE to take your money and LOSE it ALL! We are not brokers but a financial RESEARCH firm who continues to produce winner after winner in an UP or DOWN market! I need to speak with you about how this program will impact your portfolio in a POSITIVE way. BUT I cant help you if I cant speak with you. PLEASE call me ASAP at . . . so I can explain! thabnk [sic] you, Sergio."

        (h)     On or about June 26, 2015, HARDY sent an email to Investor 6 stating, in part: "As per our conversation, feel free to send your portfolio positions to this email.

I'll be glad to take a look." The email also provided: "Please remember, if you decide to pick up any of the stocks we profile, please shoot us an email back to let us know how many shares you bought and the entry price. We'll keep an eye on it for you as part of our service, and keep you posted with all updates. Its easier for us to help, if we know what you own. We appreciate your business. Have a profitable day."

        (i)     On or about August 7, 2015, ISEN sent an email to Co-Conspirator 4, stating, "Joe- Below is Rob's contact info. Please prepare an invoice for $61k made out to him for PR services. Craig tells me the total proceeds from Rob's trades yesterday was $61,130.43." The email attached contact information for GLECKMAN.

        (j)     Later on or about August 7, 2015, Co-Conspirator 4 sent an email to GLECKMAN, copying ISEN, and attaching an invoice from PTP to GLECKMAN in the amount of approximately $61,000 for "PR Services."

        (k)    On September 1, 2015, JEAN, identifying himself as "McArthur J." of "Operations / Client Services" of "Power Traders Press," sent an email from a PTP email address to new or potential subscribers with the subject "POWER TRADERS PRESS . . . . 85% Winners Last Year. YOU DON'T WANNA MISS OUT!!!"

        (l)     On or about October 15, 2015, VERDEROSA sent an email to Investor 6 with the subject line: "Fwd: GRLD Ready to go National Very Soon." The body of the email provided in pertinent part: "URGENT!!! MUST WATCH THIS LINK REGARDING THE 'GRILLED CHEESE TRUCK' (GRLD) IT IS IMPERATIVE YOU CONTACT ME IMMEDIATELY!!! DENNIS." The email also included a link to a Fox Business Channel online video with the title "Soup Nazi Hits the Road with New Food Trucks," and VERDEROSA's cellular telephone number.

(m)     On or about October 21, 2015, VERDEROSA sent an email to Investor 6 complaining, in sum and substance, that he had been trying to reach her on several occasions but she had not returned his calls. The email provided in part: "If we cant communicate, I cant help you. Big news on 3 issues you are holding. If YOU dont care about whats going on, PLEASE let me know with a call back. I have clients who have been in this position (same as you) who had the patience to weather the ups and downs and did very well . These companies TRADE all day long and eventually they do EXACTLY what we hoped....and thats GO UP! I need a call TODAY as I am too busy to chase you! Cant help if I cant speak to you!"

(n)     On or about November 18, 2015, ISEN sent an email to MATZ at an email address registered to Co-Conspirator 1, with the subject heading: "The easiest sub agreements in history," and stating: "Eric- attached are the sub agreements for you and Ron. How easy are these? Fill out, scan, and send back to me. Here are the wire instructions. Please wire this week so we can close this thing and start collecting . . . ."

(o)     On or about December 3, 2015, VERDEROSA forwarded an email to Investor 6 with the subject heading "Fwd: FW: Trading Alert: Value in Waste Consolidation - NWMH DENNIS PTP." The body of VERDEROSA's introductory message provided: "THIS IS HUGE!!!!!!!!!!!!!!!"

(p)     On or about July 27, 2016, ANTOS conducted a matched trade, in which ANTOS sold approximately 300 shares of ICEIF and a Co-Conspirator 1 Brokerage Account purchased approximately 300 shares of ICEIF.

36

(q)     On or about September 19, 2016, ANTOS conducted a matched

trade, in which ANTOS sold approximately 459 shares of ICEIF and the Co-Conspirator 6

Brokerage Account purchased approximately 459 shares of ICEIF.

(r)     On or about September 19, 2016, COHEN, using the false name

"Ian Grant," called two investors ("Investor 9" and "Investor 10," respectively), individuals

whose identities are known to the Grand Jury, and aggressively urged them to execute a limit

order purchasing shares of ICEIF, stating, in part, on a recorded call: "Okay...43 cents, I'm

sorry, 43 cents, that will get you [unintelligible]...now make sure that you always go in good 'til

cancelled – GTC – so it's, so we got ICEIF...we've got a limit order...actually you know what

I'll get you a cheaper bid right now, go in at a limit order of 37 cents, okay? So go in with

30,000 shares because I got you to save some money [unintelligible], 30,000 shares at a limit

order of 37 cents make sure you go in good 'til cancelled, GTC, good 'til cancelled, hurry up and

get that in, I'm gonna stay on the line with you."

(s)     On or about November 21, 2016, ANTOS conducted a matched

trade, in which ANTOS sold approximately 500 shares of ICEIF and the Co-Conspirator 6

Brokerage Account purchased approximately 500 shares of ICEIF.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
(Conspiracy to Commit Wire Fraud)

110.     The allegations contained in paragraphs one through 106 are realleged and

incorporated as though fully set forth in this paragraph.

111.     In or about and between January 2014 and July 2017, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

37

defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN, MICHAEL

WATTS, ROBERT GLECKMAN, ERIK MATZ, RONALD HARDY, BRIAN HEEPKE, also

known as "Brian Targis," DENNIS VERDEROSA, EMIN L. COHEN, also known as "Ian

Grant," PAUL EWER, MCARTHUR JEAN, also known as "John McArthur," ASHLEY

ANTOS, ROBERT GILBERT and SERGIO RAMIREZ, together with others, did knowingly

and intentionally conspire to devise a scheme and artifice to defraud investors and potential

investors in the Manipulated Public Companies, and to obtain money and property from them by

means of materially false and fraudulent pretenses, representations and promises, and for the

purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means

of wire communication in interstate and foreign commerce writings, signs, signals, pictures and

sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
(Securities Fraud – The NWMH Stock Manipulation)

112.    The allegations contained in paragraphs one through 106 are realleged and

incorporated as though fully set forth in this paragraph.

113.    In or about and between December 2014 and February 2016, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JEFFREY CHARTIER, STEPHANIE LEE, ERIK MATZ, RONALD HARDY,

BRIAN HEEPKE, also know at "Brian Targis," DENNIS VERDEROSA, EMIN L. COHEN,

also known as "Ian Grant," PAUL EWER and ASHLEY ANTOS, together with others, did

knowingly and willfully use and employ one or more manipulative and deceptive devices and

contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities

38

and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a)

employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue

statements of material fact and omitting to state one or more material facts necessary in order to

make the statements made, in light of the circumstances in which they were made, not

misleading; and (c) engaging in one or more acts, practices and courses of business which would

and did operate as a fraud and deceit upon one or more investors and potential investors in

NWMH, in connection with the purchase and sale of investments in NWMH, directly and

indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States

Code, Sections 2 and 3551 et seq.)

## COUNT FOUR
(Securities Fraud – The 2014 CESX Stock Manipulation)

114.    The allegations contained in paragraphs one through 106 are realleged and

incorporated as though fully set forth in this paragraph.

115.    In or about and between January 2014 and May 2014, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JEFFREY CHARTIER, STEPHANIE LEE and ANTHONY VASSALLO, together

with others, did knowingly and willfully use and employ one or more manipulative and

deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the

United States Securities and Exchange Commission, Title 17, Code of Federal Regulations,

Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b)

making one or more untrue statements of material fact and omitting to state one or more material

facts necessary in order to make the statements made, in light of the circumstances in which they

39

were made, not misleading; and (c) engaging in one or more acts, practices and courses of

business which would and did operate as a fraud and deceit upon one or more investors and

potential investors in CESX, in connection with the purchase and sale of investments in CESX,

directly and indirectly, by use of means and instrumentalities of interstate commerce and the

mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States

Code, Sections 2 and 3551 et seq.)

## COUNT FIVE
(Securities Fraud – The 2015 CESX Stock Manipulation)

116.    The allegations contained in paragraphs one through 106 are realleged and

incorporated as though fully set forth in this paragraph.

117.    In or about and between June 2015 and October 2015, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JEFFREY CHARTIER, STEPHANIE LEE, ERIK MATZ, RONALD HARDY and

DENNIS VERDEROSA, together with others, did knowingly and willfully use and employ one

or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the

Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code

of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and

artifices to defraud; (b) making one or more untrue statements of material fact and omitting to

state one or more material facts necessary in order to make the statements made, in light of the

circumstances in which they were made, not misleading; and (c) engaging in one or more acts,

practices and courses of business which would and did operate as a fraud and deceit upon one or

more investors and potential investors in CESX, in connection with the purchase and sale of

investments in CESX, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT SIX
(Securities Fraud – The GRLD Stock Manipulation)

118.    The allegations contained in paragraphs one through 106 are realleged and incorporated as though fully set forth in this paragraph.

119.    In or about and between September 2014 and December 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ERIK MATZ, RONALD HARDY, BRIAN HEEPKE, also know at "Brian Targis," DENNIS VERDEROSA and EMIN L. COHEN, also known as "Ian Grant," together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in GRLD, in connection with the purchase and sale of investments in GRLD, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

41

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT SEVEN
(Securities Fraud – The HECC Stock Manipulation)

120.   The allegations contained in paragraphs one through 106 are realleged and incorporated as though fully set forth in this paragraph.

121.   In or about and between August 2014 and January 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LAWRENCE ISEN, MICHAEL WATTS, ROBERT GLECKMAN, ERIK MATZ, RONALD HARDY, DENNIS VERDEROSA, EMIN L. COHEN, also known as "Ian Grant," PAUL EWER, MCARTHUR JEAN, also known as "John McArthur," and ROBERT GILBERT, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in HECC, in connection with the purchase and sale of investments in HECC, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

42

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT EIGHT
(Securities Fraud – The ICEIF Stock Manipulation)

122. The allegations contained in paragraphs one through 106 are realleged and incorporated as though fully set forth in this paragraph.

123. In or about and between February 2016 and July 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LAWRENCE ISEN, ERIK MATZ, RONALD HARDY, BRIAN HEEPKE, also known as "Brian Targis," EMIN L. COHEN, also known as "Ian Grant," PAUL EWER, MCARTHUR JEAN, also known as "John McArthur," ASHLEY ANTOS and SERGIO RAMIREZ, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in ICEIF, in connection with the purchase and sale of investments in ICEIF, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

43

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States

Code, Sections 2 and 3551 et seq.)

## COUNT NINE
(Conspiracy to Commit Money Laundering)

124.    The allegations contained in paragraphs one through 106 are realleged and

incorporated as though fully set forth in this paragraph.

125.    In or about and between January 2014 and July 2017, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants JEFFREY CHARTIER, STEPHANIE LEE, LAWRENCE ISEN, ERIK MATZ and

RONALD HARDY, together with others, did knowingly and intentionally conspire to engage in

monetary transactions, to wit: deposits, withdrawals and transfers of funds and monetary

instruments, in and affecting interstate commerce, by, through and to one or more financial

institutions, in criminally derived property that was of a value greater than $10,000 and that was

derived from specified unlawful activity, to wit: fraud in the sale of securities, contrary to Title

15, United States Code, Sections 78j(b) and 78ff, all contrary to Title 18, United States Code,

Section 1957(a).

(Title 18, United States Code, Sections 1956(h), 1957(b), 1957(d)(1) and

3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE THROUGH EIGHT

126.    The United States hereby gives notice to the defendants charged in Counts

One through Eight that, upon their conviction of any such offenses, the government will seek

forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28,

United States Code, Section 2461(c), which require any person convicted of such offenses to

44

forfeit any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including but not limited to:

(a) The real property together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings located at 2 Eagle Landing, Mt. Sinai, New York 11766;

(b) The real property together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings located at 31 Arch Lane, Hicksville, New York 11801; and

(c) The real property together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings located at 10673 Hunters Glen Drive, San Diego, California 92130.

127. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided

without difficulty;

45

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT NINE

128. The United States hereby gives notice to the defendants charged in Count Nine that, upon their conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to:

(a) The real property together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings located at 2 Eagle Landing, Mt. Sinai, New York 11766;

(b) The real property together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings located at 31 Arch Lane, Hicksville, New York 11801; and

(c) The real property together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings located at 10673 Hunters Glen Drive, San Diego, California 92130.

46

129.    If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

      (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL

_____

FOREPERSON

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

47

F. #2016R01805
FORM DBD-34
JUN. 85

No. _____

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*Jeffrey Chartier, Stephanie Lee, Lawrence Isen, Michael Watts,
Robert Gleckman, Erik Matz, Ronald Hardy, Brian Heepke,
Dennis Verderosa, Emin L. Cohen, Anthony Vassallo, Paul Ewer,
McArthur Jean, Ashley Antos, Robert Gilbert and Sergio Ramirez,*

Defendants.

## INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(b)(1), 1349, 1956(h), 1957(b)(1), 2 and
3551 et seq; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

_A true bill._

_____
Foreperson

_Filed in open court this_ _____ _day,_

_of_ _____ _A.D. 20_ _____

_____
Clerk

_Bail, $_ _____

*Alicyn Cooley / Patrick Hein, Assistant U.S. Attorneys (718) 254-7000*

# EXHIBIT B

F. # 2016R01805

# United States District Court
# EASTERN DISTRICT OF NEW YORK

In re the Seizure of:

ANY AND ALL FUNDS ON DEPOSIT IN
WELLS FARGO BANK IN THE ACCOUNTS
LISTED IN ATTACHMENT A HERETO, UP TO
THE AMOUNTS SPECIFIED THEREIN, AND ALL
PROCEEDS TRACEABLE THERETO.

**SEIZURE WARRANT**

CASE NUMBER:

**TO: The Federal Bureau of Investigation and any Duly Authorized Officer or Contractor of the United States of America:**

An affidavit having been made before me by Craig Minsky of the Federal Bureau of Investigation, who has reason to believe that the property listed above is subject to forfeiture to the United States.

I am satisfied that the affidavit establishes probable cause to believe that such property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 982(a)(1) and that grounds exist for the issuance of this seizure warrant pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 853(f).

YOU ARE HEREBY COMMANDED to seize within 14 days the property specified, by serving this warrant and making the seizure (in the daytime - 5:00 A.M. to 10:00 P.M.), leaving a copy of this warrant and receipt for the property so seized and prepare a written inventory of the property seized and promptly return this warrant as required by law.

THE ABOVE-REFERENCED FINANCIAL INSTITUTION IS HEREBY COMMANDED to effect the seizure of the contents above-referenced account(s), to include funds and/or securities up to the amounts specified herein, and to refuse the withdrawal of any amount from said account(s) by anyone other than duly authorized law enforcement agents, promptly provide officers or contractors of the Federal Bureau of Investigation with the current account balances, and continue to accrue any deposits, interest, dividends, and any other amount credited to said account(s) until the aforementioned law enforcement agents direct, in their discretion, that the contents of said account(s) be liquidated in an orderly fashion so as to maximize the value thereof.

Dated:      Brooklyn, New York
            July 11, 2017

Time:       6:00 PM

Honorable Robert M. Levy
United States Magistrate Judge

## RETURN

| DATE WARRANT RECEIVED | DATE AND TIME OF WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| | | |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Special Agent _____

Subscribed, sworn to, and returned before me this date.

_____            _____
U.S. Judge or Magistrate                                    Date

**ATTACHMENT A**
WELLS FARGO BANK

ANY AND ALL FUNDS ON DEPOSIT IN WELLS FARGO BANK IN THE ACCOUNTS LISTED BELOW, HELD IN THE NAMES LISTED BELOW, UP TO AND INCLUDING THE AMOUNTS SPECIFIED HEREIN, AND ALL PROCEEDS TRACEABLE THERETO:

| Wells Fargo Bank Account No. | Accountholder Name | Amount |
|---|---|---|
| 6133033669 | STRATEGIC CAPITAL MARKETS | $ 1,055,847.54 |
| 5966112871 | STRATEGIC CAPITAL MARKETS | $    184,661.66 |
| 2463093407 | TYPE A PARTNERS | $ 1,867,639.64 |
| 5097015050 | TYPE A PARTNERS | $    396,721.85 |
| 9194097243 | LAWRENCE D. ISEN and CHRISTINE L. ISEN | $    507,700.00 |
| 7114277317 | MARKETBYTE LLC | $ 5,195,841.82 |

# EXHIBIT C

Contents of Exhibit
to be Filed Under Seal

# EXHIBIT D



Legal Order Processing D1111-01A
P.O. Box 1416
Charlotte, NC 28262

July 21, 2017

MARKETBYTE, LLC
4653 CARMEL MOUNTAIN RD STE 308-402
SAN DIEGO CA 92130-6650

Subject:  Required withdrawal from your account ending in 7317
          Wells Fargo case number: 67676317

Dear MARKETBYTE, LLC:

We want to let you know that on July 12, 2017, Wells Fargo was served with the enclosed legal
order, in the amount of All Funds, which requires us by law to deduct money from your account.
As a result, we withdrew $68,464.61 from your account on July 20, 2017 and charged a non-
refundable processing fee of $0.00.

| Account Number | Debit Amount | Bank Fee |
|----------------|--------------|----------|
| XXXXXX7317     | $68,464.61   | $0.00    |

If you would like more information about the enclosed legal order, please contact:

        Federal Bureau of Investigations
        (631) 501-8738

If you have questions about your account, please call Wells Fargo Customer Service at (800) 344-
8170, 24 hours a day, 7 days a week.

Thank you.

Sincerely,

*Joe Medina*

Operations Manager
Legal Order Processing



Legal Order Processing D1111-01A
P.O. Box 1416
Charlotte, NC 28262

July 21, 2017

LAWRENCE D ISEN AND CHRISTINE L ISEN
LAWRENCE D ISEN TTE
CHRISTINE L ISEN TTE
10673 HUNTERS GLEN DR
SAN DIEGO CA 92130-4851

Subject:  Required withdrawal from your account ending in 7243
          Wells Fargo case number: 67676317

Dear LAWRENCE D ISEN AND CHRISTINE L ISEN, LAWRENCE D ISEN TTE, CHRISTINE L
ISEN TTE:

We want to let you know that on July 12, 2017, Wells Fargo was served with the enclosed legal
order, in the amount of All Funds, which requires us by law to deduct money from your account.
As a result, we withdrew $2,216.49 from your account on July 20, 2017 and charged a non-
refundable processing fee of $0.00.

| Account Number | Debit Amount | Bank Fee |
|---|---|---|
| XXXXXX7243 | $2,216.49 | $0.00 |

If you would like more information about the enclosed legal order, please contact:

        Federal Bureau of Investigations
        (631) 501-8738

If you have questions about your account, please call Wells Fargo Customer Service at (800) 344-
8170, 24 hours a day, 7 days a week.

Thank you.

Sincerely,

*Joe Medina*

Operations Manager
Legal Order Processing

# EXHIBIT E

SLR:BDM:TRP
F. #2016R01805

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against –

JEFFREY CHARTIER, <u>et al</u>.

           Defendants.

– – – – – – – – – – – – – – X

<u>NOTICE PURSUANT TO
FED. R. CRIM. P. 32.2(a)</u>

17-CR-372 (ILG)

      The United States of America, by and through BRIDGET M. ROHDE, Acting United States Attorney for the Eastern District of New York, and Tanisha R. Payne, Assistant United States Attorney, hereby files the following Notice Pursuant to Federal Rule of Criminal Procedure 32.2(a) for forfeiture of property.

      The above-captioned Indictment seeks forfeiture of property pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and 982(b)(1), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c). The United States hereby gives notice that, in addition to the specific property listed in the forfeiture allegation of the Indictment, the United States seeks forfeiture of the following additional property:

1.    The real property and premises located at 3475 Clark Road, Unit 173, Sarasota, Florida 34231, and all proceeds traceable thereto;

2.    The real property and premises located at 3477 Clark Road, Unit 175, Sarasota, Florida 34231, and all proceeds traceable thereto;

3.    The real property and premises located at 35 Cranberry Street, Central Islip, New York 11722, and all proceeds traceable thereto;

4.    Any and all funds on deposit in TD Bank account number XXXXXX-1791, held in the name of BCBall Inc., and all proceeds traceable thereto;

5.    Any and all funds on deposit in TD Bank account number XXXXXX-4027, held in the name of Big Little Consulting, Inc., and all proceeds traceable thereto;

6.    Any and all funds on deposit in TD Bank account number XXXXXX-9792, held in the name of Dennis J. Verderosa, and all proceeds traceable thereto;

7.    Any and all funds on deposit in TD Bank account number XXXXXX-9929, held in the name of Ewer Enterprises Inc., and all proceeds traceable thereto;

8.    Any and all funds on deposit in TD Bank account number XXXXXX-4142, held in the name of Trade Masters Consulting Inc., and all proceeds traceable thereto;

9.    Any and all funds on deposit in Wells Fargo Bank account number XXXXXX-7317, held in the name of Marketbyte LLC, and all proceeds traceable thereto;

10.   Any and all funds on deposit in Wells Fargo Bank account number XXXXXX-5050, held in the name of Type A Partners, and all proceeds traceable thereto;

11.   Any and all funds on deposit in Wells Fargo Bank account number XXXXXX-7243, held in the name of Lawrence D. Isen and Christine L. Isen, and all proceeds traceable thereto;

12.   Any and all funds on deposit in JP Morgan Chase Bank account number XXXXXX-0934, held in the name of Herman J. Matz and Maria U. Matz, and all proceeds traceable thereto;

13.   Any and all funds on deposit in JP Morgan Chase Bank account number XXXXXX-1899, held in the name of DJV Enterprises, and all proceeds traceable thereto;

14.   Any and all funds on deposit in Citibank account number XXXXXX-4701, held in the name of Joseph Matz, and all proceeds traceable thereto;

2

15.     Any and all funds on deposit in Bank of America account number XXXXXX-7752, held in the name of Mystreetresearch,com, Inc., and all proceeds traceable thereto; and

16.     One blue 2016 Chevrolet Corvette vehicle, bearing Vin # 1G1YN2D68G5611737, and New York license plate no. DCC6802, title to which is held in the name of Dennis J. Verderosa.

The United States reserves the right to supplement or amend this Notice Pursuant to Fed. R. Crim. P. 32.2(a).

Dated: Brooklyn, New York
       November 20, 2017

                                        BRIDGET M. ROHDE
                                        Acting United States Attorney
                                        Eastern District of New York
                                        271-A Cadman Plaza East
                                        Brooklyn, New York 11201

                                  By:   /s  *Tanisha R. Payne*
                                        Tanisha R. Payne
                                        Assistant United States Attorney
                                        (718) 254-6358

To:   All Counsel of Record (by ECF)

3