# EXHIBIT B

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2

3  -------------------------------X
   UNITED STATES OF AMERICA,
4                                 :  CR-17-372 (S-2)

5      -against-                  :  United States Courthouse
                                     Central Islip, New York
6  MICHAEL WATTS,
                                  :  October 21, 2019
7                  Defendant.        9:30 a.m.
   -------------------------------X
8
                    TRANSCRIPT OF TRIAL
9        BEFORE THE HONORABLE JOANNA SEYBERT
   UNITED STATES DISTRICT COURT SENIOR JUDGE, and a jury
10

11 APPEARANCES:

12 For the Government:        RICHARD P. DONOGHUE, ESQ.
                              UNITED STATES ATTORNEY
13                            BY: WHITMAN G. S. KNAPP, ESQ.
                                  KAITLIN T. FARRELL, ESQ.
14                            100 Federal Plaza
                              Central Islip, New York 11722
15

16
   For the Defendant:         JOSEPH RYAN, ESQ.
17                                    and
                              CHRISTOPHER WRIGHT, ESQ.
18

19

20

21 Official Court Reporter:   Frederick R. Guerino, CSR
   Ph. (631) 712-6105         100 Federal Plaza - Suite 570
22                            Central Islip, New York 11722

23

24

25        Proceedings recorded by mechanical stenography.
              Transcript produced by CAT.

1          Your Honor, the government next calls witness

2    Deborah Oremland.

3    D E B O R A H    O R E M L A N D,

4          called as a witness, having been first duly sworn,

5    testifies as follows:

6          THE COURT CLERK:  State your name for the record

7    and spell it, please.

8          THE WITNESS:  Deborah, D-e-b-o-r-a-h, Oremland,

9    O-r-e-m-l-a-n-d.

10   DIRECT EXAMINATION

11   BY MS. FARRELL:

12   Q    Where do you work?

13   A    I work at FINRA.

14   Q    What does FINRA stand for?

15   A    It stands for Financial Industry National Regulatory

16   Authority.

17   Q    What does FINRA do?

18   A    Self-regulatory orientation.  It is a membership

19   organization.  It regulates certain aspects of the

20   securities industry.

21   Q    Who are the FINRA members comprised of?

22   A    The members are broker/dealers and their employee

23   brokers.

24   Q    What is FINRA's mission?

25   A    FINRA's mission is to protect investors and to ensure

1  integrity in the markets.  So FINRA's rules is to govern

2  members conduct, compliance, examination of our members to

3  make sure that they are following the rules, and FINRA also

4  can discipline its members.

5           FINRA also is tasked with overseeing trading on

6  the various equities markets and options.

7  Q    What is a broker-dealer?

8  A    A broker-dealer is an entity that is in the business of

9  buying some stock either for itself or for customers.

10 Q    Who oversees FINRA?

11 A    The securities and Exchange Commission or the S.E.C.

12 Q    What is the S.E.C.?

13 A    A federal agency that is tasked with protecting

14 investors in the markets.

15 Q    What is your position at FINRA?

16 A    I'm an attorney with the Criminal Prosecution

17 Assistance Group or CPAG.

18 Q    What are your responsibilities within that group?

19 A    We assist the government in their investigations and

20 prosecutions involving securities fraud.

21 Q    How long have you worked at FINRA?

22 A    For 18 years.

23 Q    How long have you worked in the group that you are

24 currently assigned to?

25 A    For 13 years.

1  Q     Prior to working in that group, where did you work at

2  FINRA?

3  A     I started in the Market Regulations Department where I

4  would conduct surveillance of trading for potential

5  fraudulent activity, and I was there for about three and a

6  half years.  Then I went to the Enforcement Department where

7  my work focused more on member firm regulations.

8  Q     During your time at FINRA, have you conducted training

9  for law enforcement agencies?

10  A     Yes.

11  Q     Which agencies?

12  A     The FBI, IRS, postal agents, and various U.S.

13  Attorney's Offices.

14  Q     Can you describe your educational background briefly,

15  please?

16  A     I have an undergraduate degree from the University of

17  Michigan, and a law degree from American University.

18  Q     At your time at FINRA, have you come to learn the

19  securities regulations of public securities exchanges and

20  terminology used in the industry?

21  A     Yes.

22  Q     Have you ever been offered as an expert witness before?

23  A     Yes.

24  Q     Approximately how many times?

25  A     Two times.

1  Q    And were you received in both of those cases as an

2  expert witness?

3  A    Yes.

4  Q    Where were those cases?

5  A    In the Eastern District of New York.

6  Q    When were those cases?

7  A    In 2017 and 2018.

8        MS. FARRELL:  Your Honor, at this point the

9  government moves to qualify Deborah Oremland in securities

10 terminology and regulations.

11       THE COURT:  No objection?

12       MR. RYAN:  No objection, your Honor, only as to

13 terminology.

14       THE COURT:  Just a moment.

15       Ladies and gentlemen, expert witnesses because of

16 their knowledge, background, and education, are able to

17 render an opinion.  You treat their testimony like any other

18 testimony, but you are allowed to consider their opinion

19 based on their expertise and a number of other factors.

20       All right.  Please continue.

21 BY MS. FARRELL:

22 Q    Do you know the defendant Michael Watts?

23 A    No.

24 Q    As part of your work at FINRA, are you familiar with

25 what a security is?

1   A    Yes.

2   Q    Can you briefly tell us what that is?

3   A    A security is a type of financial instrument that is

4   geared towards an investment.  The term is really broad and

5   it includes, stocks, bonds, options, mutual funds.

6   Q    What is a stock?

7   A    So a stock is an ownership interest in a company.  It

8   is also referred to as an equity.  If you own stock in a

9   company, you own a certain part of it.

10  Q    And what sort of units is stock measured in?

11  A    It is measured in units of shares.

12  Q    Can you buy and sell stock?

13  A    Yes.

14  Q    And how does one do that?

15  A    You can buy and sell it on a public market, if the

16  company is publicly traded.

17  Q    And what is a publicly traded company?

18  A    A company that has its shares on the market.

19  Q    What is the difference between a private company and

20  publicly traded company?

21  A    A private company you can't go to a market and buy and

22  sell shares.

23  Q    What is a shareholder?

24  A    It is a person who owns shares in a company.

25  Q    What is a limit order?

1  A    A limit order is a type of order where it is for a

2  particular amount of stock at a particular price.

3  Q    And is that if someone wants to purchase stock?

4  A    Purchase or sell.

5  Q    Are there different kinds of public markets?

6  A    Yes.

7  Q    And what types of public markets are there?

8  A    There are national security exchanges like the New York

9  Stock Exchange or Nasdaq, and then there are

10  Over-the-Counter markets.  So the exchanges -- if you want

11  your company to trade on one of the exchanges, you have to

12  go through a really stringent listing process.  Your company

13  has to be a certain size, has to have a certain amount of

14  assets, and those companies have to make periodic reports to

15  the SEC.

16  Q    Is that for companies listed on the Nasdaq or New York

17  Stock Exchange?

18  A    Yes.

19  Q    What about companies listed on the Over-the-Counter

20  Market?

21  A    Over-the-Counter markets, the stocks are quoted

22  companies that are not listed there.  They don't have to be

23  through the same type of listing standards that companies

24  have to go through for the Exchanges.  Typically the

25  companies that trade on the Over-the-Counter Markets, they

1   are smaller companies.  They don't have a lot of assets or

2   they are just starting up.  There aren't a lot of

3   shareholders, not a lot of shares that are available to be

4   bought and sold.

5   Q    You mentioned you can buy stock in a publicly traded

6   company on the markets.

7             Can you also buy stock in private transactions?

8   A    Yes.

9   Q    Did the government ask you in this case to look at

10  certain data for a company called Hydrocarb with stock

11  ticker HECC?

12  A    Yes.

13  Q    What is a stock ticker?

14  A    A stock ticker is to identify companies on the markets.

15  Q    What markets, if any, was Hydrocarb traded on?

16  A    On the Over-the-Counter markets.

17  Q    Are you familiar with microcap stock?

18  A    Yes.

19  Q    What are microcap stocks?

20  A    Microcap stocks are smaller companies.  Their value or

21  what is called a market cap is around between 50 and

22  $300 million.

23  Q    Was Hydrocarb a microcap stock?

24  A    Yes.

25  Q    Are you familiar with the term of penny stock?

1    A    Yes.

2    Q    What does that mean?

3    A    Penny stocks are companies that don't trade on

4    Exchanges.  They are traded on Over-the-Counter Markets and

5    typically for less than $75.00 a share.

6    Q    Was Hydrocarb a penny stock?

7    A    Yes.

8    Q    Are you familiar with Finley traded?

9    A    Yes.

10   Q    What does that mean?

11   A    It is a company that doesn't trade a lot of stock on

12   any given day.  The volume of trading is low because there

13   isn't a lot -- there aren't a lot of shares that are

14   available to be bought and sold.

15   Q    Are you familiar with the term float4?

16   A    Yes.

17   Q    What is that?

18   A    Float is the amount of free trading shares that are

19   available to be bought and sold in a company.

20   Q    You mentioned free trading shares.

21        What is a restricted share?

22   A    A restricted share is a share that you cannot

     immediately sell or resell in the markets or privately.

     Q    And why are certain shares restricted?

     A    Well, it depends on your relationship with the company.

If you are an insider of the company, an officer, director, or you can exert a certain amount of control over the company, the shares that you own are restricted; and also, when you do invest in private placements, those shares are restricted as well.

Q    You mentioned somebody who could exert control over companies.

What people do that?

A    People who own a certain percentage of shares, if you own five percent or more of a company.

Q    So what is the point of these types of people having restricted shares?

A    Well, the people involved with the company have knowledge about the company that the public doesn't have. So they are not permitted to just sell stock, any amount of stock, whenever they want.

Also, there's an idea that they believe in the company, and they are invested in the company and want to see the company grow.

Q    Does Rule 144 relate to the sale of restricted stock?

A    Yes, that's the SEC rule that governs the resale of restricted shares.

Q    Can you just explain what the basic of Rule 144 is?

A    Yes.  Depending on your relationship with the company, there are various provisions in the rule that lay out how

long you have to hold on to the restricted shares before you
can make them unrestricted.

Q    What is an unrestricted security?

A    That's a free-trading share.  So if you have
unrestricted stock, you can just go out and sell it whenever
you want.

Q    How can you tell whether a security is restricted or
unrestricted?

A    There's a huge stamp on the stock certificate that says
RESTRICTED.

Q    How does a restricted share become unrestricted or free
trading?

A    You have to go through a transfer agent to do that with
and also have an attorney opinion letter.

Q    What is a transfer agent?

A    A transfer agent is a company that is a public company
used to maintain a lot of different types of information,
including shareholder lists, and they keep track of the
initial issuance of stock; and they also are tasked with
listing the restrictions off stock certificates.

Q    And you also mentioned needing an attorney opinion
letter to turn restricted letters into unrestricted letters.

        What is that letter?

A    A letter that an attorney writes based on Rule 144
that indicates why you are able to list the restrictions off

the shares and then free trade them.

Q    Typically does an attorney look at facts with those specific shares in order to render that opinion?

A    Yes.

Q    Are restricted and unrestricted shares valued differently?

A    Yes.

Q    Why is that?

A    Well, you can't immediately sell your restricted shares, so often times you sell restricted shares at a discount with the idea you will hold on to those shares because you are invested in the company and you think that the company -- you believe in it and you believe that the company can grow, so you don't mind the fact that you can't just trade it whenever you want.

Q    Under normal market conditions, how are the price levels of stock determined?

A    Determined by the economic principle of supply and demand.

       So say another company, and you don't have a large supply of stock, there isn't a lot of stock that is available to be bought and sold, but there's a lot of positive information about the company, and there's an increased demand for the stock, then you will have a stock price that will increase.

On the other hand, if you have a company that has a lot of stock out there and not a lot of positive news, and the company is not doing well, there's an increase of supply, not as much demand, and you will have a price that will decrease.

It is kind of like during the holidays, when there's like a hot toy on the market and there's a limited supply, so it sells out of the toy stores, but then you can find it on other markets just with a much higher price.

Q    What is market manipulation?

A    That is any type of interference with the normal market conditions.

Q    What are some trading methods used to manipulate the market?

A    Wash trading, match trading.

Q    What is a wash trade?

A    A wash trade is when there's no change in ownership. When you are buying and selling stock, you are essentially buying and selling with yourself.

Q    And how does one buy and sell with themselves?

A    It is a coordinated effort.  You basically own or control two different accounts and you just trade amongst those.

Q    Are you familiar with wash trades being described as supporting the stock?

A    Yes.

Q    And what does that mean?

A    Well, when you are trading with yourself, you can trade
the stock for whatever price you want.  You are
coordinating.  You can keep the price at a certain level
just by trading back and forth with yourself.

Q    How is what you just described manipulative?

A    Well, because, you know, normally when you trade, you
are not -- you don't know who is on the other side of the
market.  So the public that is out there, they don't know
that these trades are a result of a coordinated effort.
They see the stock price and they see the volume, and they
think that's, you know, you know, that's a true reflection
of what the company is worth.

Q    You just mentioned the term volume.  Can you explain
what that is?

A    The volume is the number of shares that are traded.  So
it is not the number of trades.  It is just the number of
trades that are bought and sold each day.

Q    Are you also familiar with the term match trade?

A    Yes.

Q    And what is a match trade?

A    That's another type of coordinated trade where you
coordinate with a party on the other side of the
transaction.  So there is a different account on the other

side, but it is still a coordinated trade.  And it's

typically for -- it is around the same time of day.  It is

for around the same amount and the same price.

Q    Does a match trade have to be at the exact same time?

A    No.

Q    Does it have to be at the exact same price?

A    No.  The term is substantially similar.

Q    And how is what you just described manipulative?

A    Again, the public doesn't know that there's

coordination involved.  They just see the trades.  They see

the price, and they see the volume, but they don't know who

is behind the trading, and they think that was priced

because the company that that reflects is the true value of

the company.

Q    What could be the effect of wash trades and match

trades on the stock?

A    It could cause the price to increase for a reason that

is not based on normal market conditions.

Q    Are you familiar with the term dumping stock?

A    Yes.

Q    What is that?

A    That refers to a large sell off of stock.

Q    You mentioned earlier that FINRA regulates broker-

dealers.

       What does one have to do to become a licensed

broker with FINRA?

A    You have to take an exam for your license.

Q    Must a licensed broker disclose that they are being paid to promote a stock?

A    Yes.

Q    Is it appropriate for someone to arrange the buyer on the other side of an open stock purchase?

A    No.

Q    Would a licensed broker know that all of the things we just discussed under the Federal Securities Law and the prohibited practices?

A    Yes.

Q    Was Michael Watts ever registered as a broker with FINRA?

A    Yes.

Q    How do you know that?

A    FINRA maintains a giant base called the Central Registration Depository or CRD, and it contains information about anyone who is ever registered as a broker.  I searched through the CRD and found that he had been registered.

Q    And what licenses, if any, did you find that Michael Watts held?

A    He held a Series 3, a Series 78, and a Series 63.

Q    What are those?

A    The Series 3 relates to commodities, but the Series 7

and 63, those are the exams that are called the General

Securities Representative Exams.  Really, that's the entry

level exam that you have to take to becomes a broker and can

buy and sell stock for customers.

Q    How does one obtain those licenses?

A    You have to take an exam.  It's a pretty difficult exam

to make sure individuals have the competence to be able to

deal with people's money, and they have to have a certain

understanding of how the markets work and what types of

securities that are out there.  And also to have an

understanding of the Federal Securities Laws and prohibited

practices.

Q    What are covered in those exams?

A    They are tested on various types of products, tested on

the types of markets, and also what kind of behavior is

prohibited under the laws.

Q    Does that include prohibited practices under the

Federal Securities Law?

A    Yes.

Q    What about market manipulation?

A    Yes.

Q    What year or years, approximately, did Michael Watts

obtain those securities licenses?

A    Around 1988.

Q    And were the topics that we just discussed covered in

the years that were with the exams?

A    Yes.

Q    How do you know that?

A    I reviewed the Study Guide.  There are various study
guides and outlines that still exist that indicate what
individuals have studied or reviewed in order to take and
pass the exam.

Q    Does the CRD Report that you reviewed of Michael Watts
indicate he was employed as a registered broker at any time?

A    Yes.

Q    Do you recall from when to when?

A    From around 1988 when he attained his licenses to
around 1994.

Q    In relation to this case, were you asked to prepare a
summary chart of Hydrocarb trading data and phone records?

A    Yes.

Q    Who asked you to do that?

A    The government did, you did.

Q    Did you in fact perform an analysis of the data and
create summary charts?

A    Yes.

Q    Were you paid by the U.S. Attorney's Office to do this?

A    No.

Q    Other than your salary at FINRA, did you receive any
additional payments to conduct this analysis?

A    No.

Q    Did you rely on certain materials to prepare your
charts?

A    Yes.

Q    I just handed you Government's Exhibit 39 and an
accompanying list marked as Government Exhibit 39-A and
labeled Source Documents.

          Have you reviewed this disk?

A    Yes.

Q    What does it contain?

A    It contains all of the documents that I relied upon to
create the charts.

Q    And what sort of documents are those?

A    Phone records, broker-dealer trading records, and
Bloomberg data -- phone records and trading records, and
documents received as a result of the search warrant at the
Boiler Room.

Q    Did you review some of those documents as well?

A    Yes.

Q    What was the purpose of reviewing those?

A    To identify the victims of the Boiler Room.

          MS. FARRELL:  Your Honor, for the record I will
read out that that disk contains what are already in
evidence as Government's Exhibits 8, 9, 10, 11, 16, 321-A,
325-A, 325-B, 325-C, 326-B, 326 C, 340-D1, 340-D2, 370, and

371.

BY MS. FARRELL:

Q    Have you reviewed this disk?

A    Yes.

Q    How do you know that?

A    I initialed it.

         MS. FARRELL:  Your Honor, I move to admit

Government's Exhibits 390 and 390-A.

         MR. RYAN:  No objection.

         THE COURT:  Received in evidence.

         (Government's Exhibits 390 and 390-A are received

and marked into evidence.)

BY MS. FARRELL:

Q    You mentioned that one of the types of documents you

reviewed are something called Blue Sheets.

         What is Blue Sheet data?

A    Blue Sheet data is trading data that is obtained from

special type of broker-dealer of the clearing firm.  So it

has all of the trading for a particular stock for a set

period of time.  It includes information about the accounts

that traded the stock, including customer name and address,

and also the amount of shares purchased, and the price of

the stock, whether it was a buyer's or salesperson.

Q    As part of your analysis, were you asked to look at

trading about specific parties, and specifically Michael

Watts and the Boiler Room victims?

A    Yes.

Q    How did you know who the boiler room victims were?

A    From a review of the documents received from a search warrant for the Boiler Room.

Q    When you reviewed the Blue Sheets, did you see much trading beyond Michael Watts and the Boiler Room victims during the days you were looking at?

A    No.

Q    Who else, if anyone else, was typically trading on those days?

A    There were accounts in the name of Hermann Watts and Melissa Kurtzke.  But the Blue Sheets, they contain all the trades.  So the way the market operates, that they use market makers.  They are a special type of broker-dealer that facilitates trading in the markets, and they put together the buyers and sellers.  So on the Blue Sheet you see every single step on the trade.  So you see all of the market trading activity.

Q    So I'm selling 100 shares on the market and you are buying 100 shares on the market.

        How do the market makers fit into that?

A    They put us together.  So if I'm selling 100 shares and a market maker would purchase it from me and then turn around and sell it to you.  And it's all pretty much done at

the exact same time or around the same time.  But what is
reported to the public is just that 100 shares.  You don't
report all the extra steps, because that would be a double
counting.  The market makers are just firms that are there
to put everything together.

Q     What are some names of the typical market makers?

A     There are a lot of them, but Citadel, Automated Trading
Desk.  Merrill Lynch has one called G-1 Execution.

Q     There are many, right?

A     JP Morgan has one called Canacort.  There are tons of
them.

Q     When you testified about what sort of documents you
relied on, in addition to the Blue Sheet data, you mentioned
something called Bloomberg data?

A     Yes.

Q     What is that?

A     Bloomberg data is obtained from subscription services
Bloomberg is using riding in the securities industry, and
has a lot of information in our companies, including
historical trading information.

Q     Did you rely on these documents that we just discussed
in preparing your summary charts in this case?

A     Yes.

Q     Who provided you the underlying day to review?

A     I got the Bloomberg records, but the government

provided everything else.

Q    And that includes the Blue Sheet data and telephone records that you reviewed?

A    Yes.

Q    If you can take a look -- well, just go - for the parties and the witness and the Court - to Government Exhibits 376 and 377.  You also have a binder in front of you.  It is easier to look at the paper copies.

A    Okay.

Q    Do you recognize these charts?

A    Yes.

Q    What are they?

A    These are charts obtained from Bloomberg data.

Q    Who prepared these charts?

A    I did.

        MS. FARRELL:  Your Honor, I would move admission of Government Exhibits 376 and 377 into evidence.

        MR. RYAN:  No objection.

        THE COURT:  Received in evidence.

        (Government's Exhibits 376 and 377 are received and marked into evidence.)

BY MS. FARRELL:

Q    So if you can just stake a look at Government's Exhibits 372, 373, 374 and 375, and then also 378 through 382, which are basically the rest of the charts that you

prepared.

      (Pause)

      Do you recognize all of these charts?

A    Yes.

Q    What are they?

A    These are the charts that I prepared.

Q    Are these fair and accurate summaries of the underlying data?

A    Yes.

Q    Are the underlying records fairly -- or, excuse me, are the underlying records voluminous?

A    Yes.

      MS. FARRELL:  Your Honor, I move Government Exhibits 372, 373, 374, 375, 378, 379, 380, 381 and 382 into evidence.

      MR. RYAN:  No objection to those.

      THE COURT:  Received in evidence.

      (Government's Exhibits 372, 373, 374, 375, 378 379, 380, 381 and 382 are received and marked into evidence.)

BY MS. FARRELL:

Q    Let's start with Government Exhibit 376.

      Did you perform an analysis of the Hydrocarb trading during the time period October 29, 2015 through April 15, 2016?

A    Yes.

Q    What is this chart we are looking at now?

A    This ask a stockbroker's chart, a price and volume
chart that is based out of the trade data that I got from
Bloomberg.  This shows the closing prices of Hydrocarb and
the daily share volume from the period of October 29, 2013
through April 15, 2016.

Q    Again, what is the time frame of this chart?

A    October 29, 2015 through April 15, 2016.

Q    And what is the blue line showing us?

A    That represents the price, the daily closing price
which corresponds to the column on the right.

Q    It starts with 0 and goes up to $3?

A    Right.

Q    What are the red lines?

A    The red columns, those represent the volume.

Q    And remind us what is volume again?

A    The amount of shares that were traded each day.

Q    And is the volume represented by the numbers on the
left?

A    Yes.  It corresponds to the column on the left.

Q    Starting with 0 and going up to 700,000?

A    Yes.

Q    And what does this chart show happens to the price of
the stock during this time period?

A    It shows that the stock price that is charted over a

dollar, it went up to over $2.50 around November, late

November 2015.  And then it subsequently decreased to really

close to 0 by the end of the period.

Q    Looking at Government Exhibit 377.

        What the is this?

A    This is the underlying data that was shown in the

chart.

Q    Now let's take a look at Government Exhibit 373,

please.

        What is this document?

A    This is trading comparison for Hydrocarb for the period

of October 29, 2015 through February 23, 2016.  It shows a

comparison between sales made by Michael Watts and purchases

by Power Traders or the Boiler Room customers.

Q    Can you tell the jury how to read this chart?

A    The green columns, those represent Michael Watts, his

sell volume, and the blue columns represent the customers --

the Boiler Room customers purchase amounts.

Q    Through this chart, can we see that Michael Watts sell

volume was identical to the Boiler Room by volumes on these

dates?

A    Yes, either identical or extremely close.

Q    Then if you look at Government Exhibit 375, is this the

same information as in the last chart we looked at, the

table form?

A    Yes, adjusted.

Q    What is indicated in the green?

A    Those are accounts held why Michael Watts.

Q    And what is indicated in the white under the account
end column?

A    Those are the Boiler Room victim accounts.

Q    If we can go back to 373, please.

        So, again, this is just the chart we looked at
reduced into a figure?

A    Yes.

Q    Did you compare Michael Watts trading on some of these
days that we see here in Government Exhibit 373 with his
telephone records?

A    Yes.

        MS. FARRELL:  Let's first pull up Government
Exhibit 374, please, Paton.

Q    If you can just walk us through this first page of
Government Exhibit 374?

A    So, the first page relates to Michael Watts calls HECC
Trades for October 30, 2015.

        So, starting at 9:32:47 am Erik Matz calls Michael
Watts.  The duration is a minute, 21 seconds.

        Then at 10:11:11, Erik Matz calls Michael Watts in
six seconds.

At 10:11:50 am Michael Watts calls Erik Matz.  The duration is a minute and seven seconds.

Then --

Q    Go ahead, what happens at 10/12:36 am?

A    Michael Watts enters an order to sell 7,500 shares at $1.28.

Q    And when he enters this order to sell 7,500 shares of Hydrocarb, is he still on the phone with Erik Matz, according to the phone records?

A    Yes.

Q    And then what happens next?

A    At 10:12:37, Michael Watts sells 2,000 shares at $1.28. And at the same time, 10:12:37, Arthur Watts buys 2000 shares at $1.28.

Q    Based on the documents you reviewed, is Arthur Watts a Boiler Room victim?

A    Yes.

Q    Then what happens?

A    At 10:12:41, Michael Watts sells 5,000 shares at $1.28, and Robert Trisko buys 5,000 shares at $1.28 at the same time.

Q    Is Robert Trisko a Boiler Room victim, based on the documents you reviewed?

A    Yes.

Q    We have this entry, Michael Watts enters an order to

sell 7500 shares at 10/12:36 am, which is circled in red.

Do the subsequent sales of 2,000 and then 5,000 shares come from that original order to sell?

A    Yes.

Q    And so they are not separate transactions; is that right?

A    Right.

Q    And then after these sales of 2,000 and 5,000 shares by the defendant to Boiler Room victims, what happens next?

A    There are more phone calls at 10/19:44.  Erik Matz calls Michael Watts.  The duration is 59 seconds.

At 10:21:24, Erik Matz calls Michael Watts.  The duration is 23 seconds.

At 10:22:54, Erik Matz calls Michael Watts, and the duration is 39 seconds.

Q    And just to be clear about your charts, are the phone calls represented in blue and the trades represented in green?

A    Yes.

Q    And then at the bottom of this page it says prepared by FINRA, and then lists a number of sources.

What is that?

A    Those are the sources that I relied upon to make the chart.

Q    Those are all in evidence?

A    Yes.

Q    If we can look at the next page, please, of Government Exhibit 374.

         If you can walk us through this chart as well, please?

A    This chart is for November 25, 2015 at 10/19:27 am. Michael Watts calls Power Traders, and the duration is a minute and 52 seconds.

         Then at 11:03:16, Michael Watts enters an order to sell 2,000 shares at a $1.32.

         At 11:03:23, Michael Watts sells 1,807 shares at $1.32.

         Then at the same time, 11:03:23, Brooks Armstrong buys 1,807 shares at a $1.32.

Q    And is Brooks Armstrong a Boiler Room victim, based on the documents you reviewed?

A    Yes.

Q    Let's take a look at the next page, please.

         In this one if you can walk us through this chart, December 14, 2015.

         If you can zoom in and work our way down, it is a little small, Paton?

A    Well, it starts at 1:36:06.  Power Traders call Michael Watts.  The duration is nine seconds.

         At 1:44:27, Erik Matz calls Michael Watts.  The

duration is 46 seconds.

At 1:49:55, Michael Watts calls Erik Matz.  The duration i a minute and 21 seconds.

Then at 3:49:02, Erik Matz calls Michael Watts. The duration is three minutes and 59 seconds.

Q    Then what does he do -- what does the defendant do at 3:50:09:00 pm?

A    He enters an order to sell 26,000 shares at a $1.61.

Q    At this time is he still on the telephone with Erik Matz?

A    Yes.

Q    How do we know that?

A    Phone records.  The call lasted three minutes and 59 seconds.

Q    So after he enters that order to sell 26,000 shares of Hydrocarb at $1.61, what happens?

A    At 3:51:54, Michael Watts sells 5,800 shares at $1.63, and at the same time, 3:51:54, Andreas Ueland buys 5,800 shares at 1.63.

Q    And then what are -- if you can scroll down, it looks like there are four trades that all happen at 3:54:50 pm.

Could you walk us through those?

A    Michael Watts sells 11,800 shares at $1.61.

Jerald Reinshagen buys 11,800 shares at $1.61.

At the same time there's a transaction between

Michael Watts and Armstrong Electric account where he sells

5,000 shares at 1.61, and the Armstrong Electric account

buys 5,000 shares at 1.61.

Q    And then what is the next set of transactions?

A    I believe at 3:55:06, Michael Watts sells 2,790 shares

at $1.61 to Steven Dininger, who buys 5,900 shares at $1.61.

Q    Dininger obviously buys more shares than Watts sells.

         Can you explain what is going on there?

A    He probably -- he purchased more from a market maker

account.

Q    If we can zoom out of that entire transaction.

         The initial order to sell 26,000 shares, and then

that's broken up into a series of smaller trades, 5800,

11,800, 5,000, et cetera.

         Who in the market is taking that large order to

sell, then breaking it up to match it up to sell it to these

victims?

A    Trading accounts, market makers.

Q    So, does that illustrate their role of market makers?

A    One of their roles, yes.

Q    Okay.

         If you can go to the next, please, which is

December 24, 2015, Christmas Eve.

         If you can walk us through this transaction,

please?

A     Sure.

On December 24, 2015, at 9:37:26, Power Traders calls Michael Watts.  The duration is 35 seconds.

At 9:40:21, Michael Watts enters an order to sell 19,000 shares at $1.58.

Then at 9:40:40, Michael Watts sells 6,300 shares at $1.58.  At the same time Clifford Jenne buys 6,300 shares at $1.58.

Q     And then what is the next transaction at 9:41:02 am on December 24th?

A     Michael Watts sells 10,267 shares at a $1.58 to Brooks Armstrong, who buys the same amount at the same price.

Q     Then a minute later what happens?

A     Power Traders call Michael Watts.

Q     Then do they have a flurry of phone calls later in the day as well?

A     Yes.

Q     And then there's a call from Erik Matz to Michael Watts as well.

And all of these times are in EST.

What does that mean?

A     Eastern Standard Time.

Q     If you can take a look at the next page, January 7, 2016.

Does this follow largely the same pattern of all

of the other charts we looked at?

A    Yes.

Q    Can you quickly summarize for us what we see here?

A    Several calls on this chart starting at 9:49 between Michael Watts and the Boiler Room, Erik Matz.  Then Michael Watts calls Wilson Davis, which is his broker-dealer at the time.

Q    So why would one call their broker-dealer?

A    To put in an order.

Q    Then what happens after he calls his broker?

A    There's an order entry to sell 30,000 shares of Hydrocarb.  There's a call from Power Traders to Michael Watts after that.  But at 11:28:55, Jenne buys 9,700 shares at a $1.51.

Q    Michael Watts sells those shares; is that correct?

A    Yes.

Q    The sale happens a few seconds, about a minute after the buy.

        What do we take from that?

A    Michael Watts had entered his order to sell those shares.  The customer, Clifford Jenne, had purchased those shares from Wilson Davis, from the trading firm, at that exact time, because the firm knew that Michael Watts had this order to sell the stock.

        And then at 11:29, the firm purchases the stock

back from Michael Watts.

Q    Then if we scroll down, does Michael Watts again call his broker?

A    Yes.

Q    And after that, is there another series of buys by Boiler Room victims and selling to Michael Watts, along with calls to Power Traders?

A    Yes.

Q    Let's move on to the next page.

          Now we are on January 8, 2016.

          Does this chart follow the same pattern as what we have seen in the previous charts?

A    Yes.

Q    Does this chart again show Michael Watts calling Erik Matz and/or Erik Matz calling Michael Watts?

A    Yes.

Q    Do we see Michael Watts call his broker Davis?

A    Yes.

Q    Do we see Michael Watts selling shares?

A    Yes.

Q    And Boiler Room victims buying Hydrocarb shares at approximately the same time in volume and price that is being sold by the defendant?

A    Yes.

Q    If we can go to the next page.  That's the last page of

that document.

(Continued on the next page.)

BY MS. FARRELL:

Q.    On the very early charts, if we go back to, for example, the very first page.

In this sequence of events, we do not see Michael Watts calling his broker.

Why is that?

A.    He had an account at Ameritrade.  That's an online firm.  So he can enter those orders himself.

Q.    Whereas what is the case with Wilson Davis?

A.    That's a different type of broker-dealer where he can't do it online.

MS. FARRELL:  If we could take a look at Government Exhibit 372.

(The above-referred to exhibit was published.)

Q.    What is this document?

A.    These are all the calls and trades regarding Michael Watts and HECC for January 6, 2016.

Q.    And why does this chart look different than the six we just looked at?

A.    Because there's so many more calls and trades on this day.  You can't fit it into the same format.

Q.    Let's just scroll down through these.

So, were there over approximately three dozen calls between the defendant and Power Traders and/or his broker that day?

A.     Yeah.

Q.     And then also many trades?

A.     Yes.

Q.     Were you asked to look at the trading of Melissa
Kurtzke and Hermann Matz?

A.     Yes.

Q.     Do you know who they are?

A.     No.

Q.     Did you create a chart of their trading in late
November 2015?

A.     Yes.

            MS. FARRELL:  If you could put up Government
Exhibit 380, Paton.

Q.     What did you observe about these trades in the
Kurtzke and the Matz accounts?

A.     On most of the -- most of these days, they bought and
sold the same or very similar amount of shares.

Q.     Are these transactions economically rational?

            MR. WRIGHT:  Objection.

            THE COURT:  Sustained.

Q.     What else did you observe about these transactions?

A.     For some of these transactions, that accounts bought
shares at a higher price than what they sold it for.

Q.     Did the Government ask you to create this chart
because the indictment makes allegations regarding these

two accounts trading during the time period in this chart?

A.   Yes.

Q.   Did you also make a chart of Melissa Kurtzke, Hermann Matz and Michael Watts' trading in Government Exhibit 382?

A.   Yes.

     MS. FARRELL:  If we could take a look at that exhibit, please.

     (The above-referred to exhibit was published.)

Q.   What does this chart show us?

A.   This chart shows that on the certain days during this period, there were trades between Hermann Matz and Michael Watts and Melissa Kurtzke and Michael Watts at or around the same time for the same amount and the same price.

     There are also some trades between -- there are some trades captured here between Matz and Kurtzke for around the same time, same amount, same price.

Q.   Did the Government ask you to prepare this chart?

A.   No.

Q.   Why did you make it?

A.   Because it's -- there's a trading pattern that I observed when I reviewed the records.

Q.   Did the Government also ask you to look at the trading of Cliff Jenne during the same time period?

A.   Yes.

Q.   Is Government Exhibit 379 a chart of that trading?

A.    Yes.

Q.    And this is just trading of Cliff Jenne in late November 2015.

          Correct?

A.    Yes.

Q.    Did the Government ask you to do this because the indictment makes allegations of Cliff Jenne's trading during this time period?

A.    Yes.

Q.    And he was a Boiler Room victim, right?

A.    That's right.

Q.    So, what do we see in this chart?

A.    It indicates for the three days how many shares Cliff Jenne purchased and how much he spent on those shares overall.

Q.    Were you also asked to look at the trading of Robert Gleckman from October 30th of 2015?

A.    Yes.

Q.    Do you know who Robert Gleckman is?

A.    No.

          MS. FARRELL:  If we could take a look at Government Exhibit 378, please.

          (The above-referred to exhibit was published.)

Q.    What does this chart tell us?

A.    This chart shows for various trading dates the

proceeds that the account made from trading from -- from

selling stock HECC.

Q.    Its stock in Hydrocarb.

        Is that right?

A.    Yes.

Q.    Were you then also asked to look at trading of Joe

Rogers in November of 2015?

A.    Yes.

        MS. FARRELL:  If we could look at Government

Exhibit 381, please.

        (The above-referred to exhibit was published.)

Q.    Do you know who Joe Rogers is?

A.    No.

Q.    What did you observe on these days?

A.    That he sold various amounts of shares on these days

and it indicates how many shares he sold and the proceeds.

Q.    And these are shares of Hydrocarb that he sold in

November of 2015?

A.    Yes.

Q.    Were you also asked to review some of the brokerage

records of the defendant in this case?

A.    Yes.

        MS. FARRELL:  If we could take a look at it's

Government Exhibit 325-A, which is the defendant's TD

Ameritrade account.  And if we could go to page 15 to

start, please.  If we could scroll through to page 19.

          (The above-referred to exhibit was published.)

Q.   Did you observe a $70,000 transfer out of the
defendant's TD Ameritrade account on November 6th of 2015?

A.   Yes.

Q.   And is that what's been highlighted on the screen?

A.   Yes.

Q.   And below is the account activity for this month's
transactions in the defendant's TD Ameritrade account.

          What was the starting balance of this account at
that time?

A.   It had a negative balance of $1500.

Q.   And then as we see money coming into the account,
where is it coming from?

A.   From sales of Hydrocarb.

Q.   Are all of the inputs into this account leading up to
the $70,000 transaction inputs from selling Hydrocarb
stock?

A.   Yes.

Q.   Does this time period in approximately October 2015
coincide with the trading that we saw on Government
Exhibit 373?

A.   Yes.

          MS. FARRELL:  If we could pull up 373, please,
just to remind them.

(The above-referred to exhibit was published.)

Q.   So, the trading that we see in October and November
2015 on the left corresponds with the sales that we see
the money from the sales coming into the account in the
exhibit on the right?

A.   Yes.

MS. FARRELL:  On the right, Paton, if you could
put up what's in evidence as Government's Exhibit 361-B,
please.

(The above-referred to exhibit was published.)

Q.   Did you prepare this chart?

A.   No.

Q.   Looking below where it says Michael Ernest Watts and
Cynthia Watts and down below that, do you know anything
about those accounts?

A.   No.

Q.   Does the very top of the chart, does this very top
transaction in the chart correspond with the $70,000 ACH
out that we see in Government Exhibit 325-A?

A.   Yes.

MS. FARRELL:  If we could clear the screen,
Paton, please.

And take a look next at -- actually, go back,
please, to Government Exhibit 325-A for the whole screen,
please.  But this time we're going to be looking at pages

99 through 107 of the TD Ameritrade account records.

(The above-referred to exhibit was published.)

Q.   In this account statement which covers December 2015,
did you observe a $75,000 transfer out of the defendant's
account on December 17th, 2015?

A.   Yes.

Q.   It's specifically on page 102 of this document.

MS. FARRELL:  Paton, if you could highlight the
$75,000 transaction out.

Q.   And when you reviewed this account statement, were
the inputs all from trading proceeds in Hydrocarb stock?

A.   Yes.

Q.   And was the beginning balance of this account at the
time sufficient to cover the $75,000 transfer out?

A.   No.

Q.   So, did that money come from trading in Hydrocarb
stock?

A.   Yes.

Q.   And does all that trading correspond with the trading
that we saw in your exhibit that you created, Government
Exhibit 373?

A.   Yes.

MS. FARRELL:  Paton, on the left if we could put
up what is in evidence as Government Exhibit 361-C,
please.  And if you could just highlight again the $75,000

transaction going out.

        (The above-referred to exhibit was published.)

Q.   The chart on the left marked as Government

Exhibit 361-C, did you prepare that?

A.   No.

Q.   Other than the top line, have you reviewed any of the

accounts that it represents?

A.   No.

Q.   Below the top line?

        But the very top where it says TD Ameritrade

12/17/15 75,000, does that correspond with the transaction

that we see in Government Exhibit 325-A?

A.   Yes.

Q.   On page 102?

A.   Yes.

        MS. FARRELL:  Paton, if you could please put up

Government Exhibit 326-B.

Q.   This is defendant's Wilson Davis' brokerage records.

And if we could specifically go to pages 7 through 12,

it's the account statements for the months March through

January 2016.

A.   Yes.

Q.   Did you observe a $386,400 transfer out of this

account on January 13th, 2016?

A.   Yes.

Q.   And if we could go to page 9 of this document, and if you could highlight the January 13 wire out.

     Is that the transaction you observed?

A.   Yes.

Q.   Was the beginning balance of this statement $500?

     (Pause.)

Q.   You see there beginning value as of January 1st?

A.   Yes.

Q.   So, were the inputs that came into this account that allowed the defendant to make this, you know, $386,400 transfer out, did all of those inputs come from selling Hydrocarb stock?

A.   Yes.

Q.   And did those sales correspond with the trading that we saw in part on your exhibit that you prepared, Government Exhibit 373?

A.   Yes.

     MS. FARRELL:  If you could put up on the left, Paton, please, Government Exhibit 361-D.

     (The above-referred to exhibit was published.)

Q.   Again, did you prepare this chart?

A.   Yes.

     Sorry.  No, I did not.

Q.   Do you know anything about the accounts that are listed below the very top line of the chart?

A.    No.

Q.    But as to the very top line of this chart where it says Wilson Davis and Company 1/13/16 386,400, does that correspond with the wire out that we see on the right in Government Exhibit 326-B page 9?

A.    Yes.

Q.    And that money was derived from trading in Hydrocarb.

        Is that right?

A.    That's right.

        MS. FARRELL:  We have no further questions, Your Honor.

        THE COURT:  Cross-examination?

        MR. WRIGHT:  Yes.  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WRIGHT:

Q.    Good morning, Ms. Oremland.

A.    Good morning.

Q.    Did I say your name correctly?

A.    Yes.

Q.    Thank you.

        Ms. Oremland, you told us on direct you've never met Michael Watts.

        Right?

A.    That's right.

Q.    You've never spoken to Michael Watts.

Correct?

A.    That's right.

Q.    In the exhibits that we went through, some of those

exhibits show phone calls between Mr. Watts and various

other parties.

Right?

A.    Yes.

Q.    Now, you don't have a recording of those phone calls.

Correct?

A.    Right.

Q.    Okay.

And you've never spoken to Mr. Watts about those

phone calls.

Correct?

A.    Right.

Q.    Okay.

Have you ever spoken to Erik Matz?

A.    No.

Q.    So, you can't tell this jury what was actually said

in those phone calls between Mr. Watts and Erik Matz.

Correct?

A.    Yes.

Q.    Have you spoken to any single person who ever worked

at Power Traders Press?

A.    No.

Q.    So, those phone calls between Mr. Watts and PTP, you

can't tell this jury what was said in those phone calls.

        Correct?

A.    Yes.

Q.    So, when the trades and security transactions you've

been talking about, you can't tell this jury what Mr.

Watts knew or didn't know about the trades that he was

involved in.

        Right?

A.    I'm not sure I understand your question.

Q.    Well, you can't tell the jury what Mr. Watts knew

about the trade as he was making the trade.

        Correct?

        In other words, you can't tell the jury the

rationale as to why Mr. Watts chose to buy or sell a

particular trade.

        Correct?

A.    Right.

        MR. WRIGHT:  Paton, if you could be so kind to

show us GX-372.

        (The above-referred to exhibit was published.)

Q.    So, the phone calls that we have here -- by the way,

you've never spoken to Clifford Jenne.

        Right?

A.    Right.

Q.   You've never spoken to William Knapp.

        Right?

A.   That's correct.

Q.   How about Robert Gleckman, you ever speak to him?

A.   No.

Q.   Eric Thoreson?

A.   No.

Q.   Victoria Cruickshank?

A.   No.

Q.   Would it be fair to say in regards to this case, the only people you've spoken to about it would be FBI agents, probably Agent Minsky.

        Am I correct?

A.   Yes.

Q.   I imagine you've spoken to Ms. Farrell, US Attorney Ms. Farrell.

        Right?

A.   Yes.

Q.   How about Mr. Knapp, have you spoken to Mr. Knapp?

A.   Yes.

Q.   Other than the FBI agents and the U.S. Attorneys, have you spoken to anyone else about this case?

A.   Anyone else?

Q.   Any of the other parties involved in this case, either defendants, or as you described them, victims?

A.   No.

         MR. WRIGHT:  And, so, if we could see the next
page, if you would be so kind, Paton.

         (Pause.)

Q.   Here again, you've never spoken to Bruce Miller or
Susan Lake.

         Is that right?

A.   That's correct.

Q.   So, again you could not tell this jury the rationale
as to why those individuals chose to buy HECC stock.

         Right?

A.   I don't know.

Q.   Now, with respect to your employment, you're employed
by FINRA.

         Right?

A.   That's right.

Q.   And FINRA is overseen by the Securities and Exchange
Commission.

         Correct?

A.   Yes.

Q.   And the SEC, that's a government agency.

         Correct?

A.   Yes.

Q.   And FINRA is accountable to the SEC.

         Correct?

A.    Yes.

Q.    And, in fact, it's regulated by the SEC.

      Right?

A.    Yes.

Q.    And the area that you work in at FINRA is the CPAG,

right?  Criminal Prosecution Assistant Group.

      Did I get that right?

A.    Yes.

Q.    And your job or your responsibility is to assist

prosecutors when they're prosecuting various types of

securities fraud.

      Right?

A.    Yes.

Q.    And you've testified, I imagine, many times on behalf

of the Government.

      Right?

A.    Yes.

Q.    Have you ever testified for a defendant?

A.    No.

Q.    And part of your job at FINRA is to do what you've

done today, to come to court and testify.

      Right?

A.    Yes.

Q.    To assist the prosecutor in the prosecution of the

case.

672

Correct?

A.    Yes.

Q.    And indeed, as you are documenting this case and
collating data and making these charts, the idea is you
are assisting the Government with the prosecution of Mr.
Watts.

Correct?

A.    Yes.

Q.    So, in preparing the analysis that you've told us
about today, the various time frames that you've looked at
regarding HECC stock, those are time frames that the
Government told you to look at.

Right?

A.    It was a collaborative effort.  The Government
provided me with all the trading records, and I chose the
time frames based on the trading that I observed.

Q.    Well, for instance, in GX-370, that's the blue
sheets.  I'm not asking you to look at them.  I know
they're voluminous.  But you did look at them.

Right?

A.    Yes.

Q.    And you looked at them, I imagine you went over them
with a fine tooth comb.

Right?

A.    Yes, I did review the blue sheets.

Q.   And indeed, they were the source for many of the graphs that you've shown us today.

Right?

A.   Yes.

Q.   And in that exhibit, GX-370, the time frame is October 1st, 2015 until February 25 of 2016.

Correct?

A.   I'm not positive what the exact time frame was.

Q.   Does that sound about right?

A.   I think so.

Q.   And you're aware that Hydrocarb, as a company, existed before October 1st, 2015.

Right?

A.   Yes.

Q.   And you're aware that HECC as its ticker existed before October 1st, 2015.

Right?

A.   Yes.

Q.   So, there was trading activity regarding HECC stock before October 1st, 2015.

Correct?

A.   Yes.

Q.   And that activity, do you know how long, how far back HECC trading activity went?

A.   No.

Q.    Would you be surprised to learn that it went back
several years before October 1st, 2015?

A.    I don't know.

Q.    You didn't look at that.

      Right?

A.    No.

Q.    Okay.

      And the Government also told you what persons,
what people they wanted you to look at as you looked at
these documents.

      Right?

      MR. WRIGHT:  In other words, let me rephrase.

Q.    The Government told you who they wanted you to focus
in on as you were looking through the blue sheets and
other documents you looked at.

      Correct?

A.    The case -- the defendant in this case is Michael
Watts.  So I am going to be reviewing it for Michael
Watts's trades.

Q.    Correct.

      But you also looked at other people involved,
right?

      For instance, you looked at Robert Gleckman.

      Correct?

A.    Yes.  They asked me to review those trades, yes.

Q.    And you would signal -- the Government asked you to find particular investors in HECC stock.

          Right?

A.    I don't understand your question.

Q.    Well, for instance, you testified regarding Clifford Jenne.

          Right?

          Do you remember talking about Mr. Jenne?

A.    Yes.

Q.    The Government told you to find information regarding the trading activity for Mr. Jenne.

          Correct?

A.    For that one distinct period that was referred to in the indictment, yes.

Q.    In other words, you didn't find it on your own. Rather, the Government directed you to find this individual.

          Right?

A.    For that one chart, yes.

Q.    As to Robert Gleckman.  I believe it's GX-371.

          MR. WRIGHT:  Could we see GX-371?

          (The above-referred to exhibit was published.)

          MR. WRIGHT:   Am I right?  I'm sorry.  Not 371. Forgive me.

          (Pause.)

          MR. WRIGHT:  Robert Gleckman is 378.

          (The above-referred to exhibit was published.)

Q.   Now, Ms. Oremland, did the Government tell you that

Mr. Gleckman was a victim or a defendant in this case?

A.   They didn't.

Q.   They didn't tell you either way.

          Do you know as you sit here today whether Mr.

Gleckman is a co-defendant in this case?

A.   I don't know.

Q.   And I notice you have total proceeds listed here.

          Right?

A.   Yes.

Q.   Proceeds, does that mean the earnings that he made in

the sale of those stocks?

A.   Yes.

Q.   So, Mr. Gleckman, in all of those, sold stocks.

          Right?

A.   That's right.

Q.   Can you tell this jury the gain or the losses that

Mr. Gleckman made in trading HECC stock?

A.   I can -- only thing that is shown here is the

proceeds from the sales.

          So, I don't know how much he made overall or how

much he lost.

Q.   Now, let's go over, if we could, the blue sheets and

a bit about what they are.

So, they contain all the trading data of
clearing firms.

Right?

A.    Yes.

Q.    And, so, that would be all of the trading activity
that transpired regarding HECC stock.

Right?

A.    Right.  For the set period of time.

Q.    For a set period of time.  Fair enough.

And the blue sheets, tell us how are the blue
sheets made?  What are they?

A.    It's -- it's an electronic submission of trade data.
It's used in the regulatory environment.  So, when the SEC
or FINRA are looking at trading in the stock, they'll
request the blue sheets from the clearing firm.  So you
get a full picture of what was happening in the stock.
You get behind who was trading and details about the
accounts.

Q.    It shows basically every time -- would it be fair to
say in regards to this case, in the period of time you
looked at, it would show every time a sale or a buy or a
short sale were made regarding HECC stock.

Right?

A.    Yes.  It should.  It's generated electronically and

it's requested electronically from the SEC or FINRA to all the market participants, and then they return the data to the agencies to review.

Q.   And it's a detailed database with the names and the brokerage firms and the clearing firms and related information regarding each trade.

        Correct?

A.   Yeah.  It's in the form of a spreadsheet usually.

Q.   An Excel spreadsheet, right?

A.   Yes.

Q.   Now, when you told us about I think it was --

        MR. WRIGHT:  If we could see 376 and, if possible, 377.

        (The above-referred to exhibit was published.)

Q.   And, so, on 376 and 377, you relied on Bloomberg for that information.

        Right?

A.   Yes.

Q.   Now, Bloomberg is Bloomberg that we know, once former mayor of New York City, he founded the company and they provide this information for the financial industry.

        Right?

A.   Yes.

Q.   And securities companies and investors rely on Bloomberg information.

        Right?

A.    What do you mean?

Q.    Well, it informs investors about the activity

regarding a particular security.

        Right?

A.    Yes.

Q.    Okay.

        And, now, the blue sheets, though, are not

available for the public information.

        Right?

A.    No, not at all.

Q.    Those are kept by the SEC or by FINRA.

        Right?

A.    Yes.

Q.    And you'd agree with me that the blue sheets are a

heck of a lot more detailed than the Bloomberg reports.

        Right?

A.    They contain very detailed information about the

trading.  Bloomberg just shows what's reported to the

public, the price and the volume.

Q.    And, so, for instance on October 30th, 2015, the

market volume according to the Bloomberg report was

81,154.

        Am I right?

A.    Yes.

Q.   Now, the blue sheet share volume for that same day
was 399,402.

          Isn't that right?

A.   I don't know.

Q.   You didn't look at that?  You didn't add up the
volume of shares according to the blue sheets?

A.   No.

Q.   And if we look at November 25, 2015, Bloomberg shows
248,339 volume.

          Right?

A.   Yes.

Q.   Just so we understand, the volume is the number of
shares traded.

          Right?

A.   Yes.

Q.   Not the number of trades that happened?

A.   Right.

Q.   But theoretically you could have one trade for a
million shares and a million trades for a dollar per
share.

          Right?

          I'm sorry, a hundred's the minimum, right?  A
hundred is the minimum number of shares that could be
traded?

A.   Yeah, that's reported to the public.

Q.    And, so, again, on November 25 again, the blue
sheets -- I'm sorry.  This shows 248,339.

        Right?

A.    Yes.

Q.    And the blue sheets share volume for that same day
showed 1,205,556.

        Isn't that right?

A.    I don't know.

Q.    So you didn't look at the blue sheet share volume for
any of the days in particular that you testified about?

A.    No.

        But the blue sheets, as I mentioned, are all of
them --

Q.    Just answer my question, ma'am.  Yes or no.

A.    I did not compile the volume, no.

Q.    Per the blue sheet data that you analyzed, again this
would be the data that the SEC has and FINRA has that
would reflect the trading activity of HECC stock.

        Right?

A.    Yes.

Q.    And this, again, would show the number of times in
addition to the share volume.  The blue sheet data would
show the number of times the stock was actually traded on
a particular day.

        Right?

A.    The blue sheets show all the trades.

Q.    Correct.

So, one could go in the Excel spreadsheet, highlight a particular day and figure out how many trades of HECC stock were made in that particular day.

Correct?

A.    Yes.

Q.    In fact, you can do it for an entire year, right, if you so chose?

A.    If you had the data.

Q.    So, regarding the data that you looked at again in GX-370, that data was from October 1st, 2015 until February 25, 2016.

And isn't it true, ma'am, according to that data, that HECC stock was bought, sold or short sale 35,955 times?

A.    I don't know.

Q.    You did not look at that?

A.    No.

Q.    Did the Government tell you not to look at that?

A.    No.  That's not -- never really a part of my review, ever.

Q.    And during that same time frame, Mr. Watts, under the name Mr. Watts, sold or bought HECC stock 326 times.

Isn't that correct?

A.    I don't know.

Q.    And during that same time frame, SMDRE under the name SMDRE bought or sold HECC stock a total of 42 times.

          Isn't that right?

A.    I don't know.

Q.    Okay.

          And isn't it in fact true, during the time frame that you examined, again, in GX370, that Mr. Watts bought or sold and represented the trading activity of HECC stock, again from October 1st, 2015 until February 25 of 2016, Mr. Watts represented just one percent of all trading activity regarding HECC stock?

A.    I don't know.

Q.    Now, the Bloomberg information that you also relied on, that doesn't tell you the number of trades regarding a security.  It just tells you the volume, the market volume.

          Right?

A.    Yes.

          MR. WRIGHT:  Now, if we could, Paton, if you could be so kind as to show us GX-372.

          (The above-referred to exhibit was published.)

Q.    Now, if we could just look at this for a minute or two.

          Again, when Power Traders calls Mike Watts, you

cannot tell this jury what was said in that phone

conversation.

        Correct?

A.    Yes.

Q.    And you can't even tell us whether Mr. Watts picked

up that phone call when Power Traders called him.

        Right?

A.    No.  These show all of the calls, that there was

some -- there was a duration of time.

Q.    Correct.  But it's a theoretical matter, for

instance, at 9:32 and 48 seconds the duration is 33

seconds, it's conceivable Mr. Watts never even picked up

that phone call.

        Correct?

A.    No.

Q.    Well, it says a call to Michael Watts.

        In other words, that person could have left a

voicemail, for instance, right?  And that would be

reflected here?

A.    Whatever the -- there was a call that was accepted

and it lasted for this duration as noted.  That's all I --

I --

Q.    But you can't say -- you did not listen to this phone

call.

        Right?

A.    Right.

Q.    You haven't listened to any phone calls in this case.

        Right?

A.    That's correct.

Q.    So you can't say for sure whether in fact, for

instance, that even Mr. Watts picked up the phone when it

rang.

        Right?

A.    I don't really understand your question.

Q.    You can't say for certain as regards to this phone

call or any phone calls whether in fact, as an example,

whether Mr. Watts picked up the phone when it actually

rang?

A.    These charts show, based on my review of the phone

records, that there was a call from one number to another,

numbers that are related to these REs, there was a

duration of time that the call lasted and that's what it

shows.

Q.    I understand, but you can't say for certain whether,

in fact, Mr. Watts picked up and spoke to somebody at

Power Traders.

        Correct?

A.    I don't know.

Q.    You don't know.  Fair enough.

        THE COURT:  On that note, we'll take our

midmorning break 15 minutes.  And we'll see you back

shortly.  Thank you.

          Don't talk about the case.


          (Jury exits the courtroom.)


          (Continued on following page.)

(Recess taken.)

THE COURT:  What I'd like to do is advise the
jury that we will have summations and charge tomorrow.
That's what's planned.  I can let them know now so they
can realize they can't go to work tomorrow because weighed
a whole bunch of different schedules that I put out to
them last week.

All right.  And if it doesn't get done, then
they'll get to go to work.

I think my law clerk gave both the Government
and the defense a copy of the proposed charge.

MR. KNAPP:  She did.

(Pause.)

(Continued on the following page.)

(Jury enters the courtroom.)

THE COURT:  Please be seated.

You're still under oath.

And let me advise you, so you know during your lunchtime if you want to make plans, that we are going to be in tomorrow.  It's contemplated that there will be summations and I will give you the charge.  So you'll be deliberating tomorrow at some time, probably later in the day.

We will now proceed with this witness.

Mr. Wright.

MR. WRIGHT:  Thank you, Your Honor.

Paton, if we could see GX-374.

(The above-referred to exhibit was published.)

BY MR. WRIGHT:

Q.   Ms. Oremland, I'm going to show you these are the charts you prepared.  In this exhibit, there are six different dates from October 30th of 2015 ending January 28th of 2016.  You selected six different dates on this exhibit.

Correct?

A.   Yes.

Q.   And did the Government tell you to focus in on these six dates?

A.   It was a collaborative effort.

Q.    Mr. Watts throughout this period of time was trading on other dates.

        Correct?

A.    Yes.

Q.    And of course, we don't have all those other dates in this exhibit.

        Right?

A.    Right.

Q.    On October 30th of 2015 when trading started that morning, what was the value, what was the share price of HECC stock on October 30th, 2015?

A.    I don't know when -- at what point?

Q.    What was the opening price?  When the first trade was made on October 30, 2015, what was the share price of HECC stock at that time?

A.    I don't know.

Q.    The only thing you can tell us is what Bloomberg tells us is the closing price.

        Correct?

A.    Right.

Q.    And the closing price would be the price at the end of trading.

        Right?

A.    Yes.

Q.    So, of all the charts you prepared, and specific to

this one GX-374, none of these charts tell us the opening

price of HECC share in each of these dates.

      Correct?

A.    Yes.

Q.    And it doesn't tell us the high point, the highest

point the price -- the share reached on a particular day.

      Correct?

A.    Yes.

Q.    It doesn't tell us the low point either?

A.    No.

Q.    The charts you prepared, they don't tell us the

volume of trading throughout the day.

      Correct?

      In other words, the chart from Bloomberg tells

us the total volume for a particular day.

      Correct?

A.    Yes.

Q.    It doesn't tell us the volume of activity throughout

the day though.

      Correct?

A.    I don't understand your question.

Q.    In other words, if there is -- if there was a high

amount of volume, say, in the morning and a low amount in

the afternoon or later in the day.

      Correct?

A.    It gives the total amount for the day.

Q.    Right.

           But it doesn't tell us the volume of activity
throughout the day.

           Correct?

A.    I still --

Q.    In other words, the charts you prepared don't show us
the amount of HECC stock volume in the morning on, say,
October 30th, 2015.

           Right?

A.    The charts that I prepared show what they say that
they show, the trades and the calls and the orders.

Q.    None of the charts you prepared would illustrate
that, would show us the volume of trading in a particular
day?

A.    Except for the chart depicted from Bloomberg.

Q.    Fair enough.  Okay.

           And the same would apply November 25th, 2015.

           MR. WRIGHT:  If we could see the next page,
Paton.

           (The above-referred to exhibit was published.)

Q.    Similarly this chart, indeed none of the charts you
prepared, would tell us what the opening price that day of
HECC stock was.

           Right?

A.    Right.

Q.    And it doesn't, again, tell us the high point or the low point of HECC stock on this particular day.

         Correct?

A.    Yes.

Q.    You could have figured that out.

         Right?

         You could have used the blue sheets and figured those numbers out.

         Right?

A.    I wouldn't use the blue sheets for that.

Q.    But that could have been figured out.

         Correct?

A.    What could have been?

Q.    The opening price of HECC stock on a particular day.

A.    Yes.

Q.    Now, Mr. Watts throughout this period of time that you were looking at these documents was working with several different brokers.

         Right?

A.    I don't know.

Q.    Well, he was working with Wilson Davis.

         Correct?

A.    He had accounts at Wilson Davis.

Q.    And he also had a TD Ameritrade account.

        Correct?

A.    Yes.

Q.    And a TD Ameritrade account, that's a computer
account.

        Right?

A.    It is an online account.

Q.    And it would allow an investor to buy or sell stocks
using their online account.

        Right?

A.    Yes.

Q.    So, Mr. Watts could have used his TD Ameritrade
account to buy and sell shares.

        Correct?

A.    Yes.

Q.    And indeed he did that.

        Right?

A.    That's what the records reflect.

Q.    Okay.

        And he would have the ability to do that
independent of speaking to, say, Mr. Matz.

        Correct?

A.    I don't understand.

Q.    In other words, he could buy or sell a share through
his TD Ameritrade account without having to speak to
anyone else.  He could do it on his own.

Right?

A.   Yes.

Q.   Throughout this time as well, institutional financial institutions that were involved in the buying and the selling of HECC stock.

Right?

A.   I don't know what you mean.

Q.   Well, when you would look through the records for HECC stock, you did see that JPMorgan, for instance, had bought and sold HECC stock.

Right?

A.   I noticed that the market-making component of JPMorgan was trading.

(Continued on following page.)

BY MR. WRIGHT (Cont'd):

Q.   And Cantor Fitzgerald as well, did you see Cantor Fitzgerald?

A.   Yes, that's a market maker.

Q.   And Merrill Lynch?

A.   Merrill Lynch is a market maker.

Q.   And Citibank Investors as well?

A.   I don't recall Citibank off the top of my head.

        MR. WRIGHT:  Paton, if we could see 376.

BY MR. WRIGHT:

Q.   Ms. Oremland, this is a chart you prepared, right?

A.   Yes.

Q.   And, by the way, this chart shows trading for HECC stock from October 29, 2015, until April 14, 2016, correct?

A.   April 15th, 2016.

Q.   April 14, 2016, right?

A.   No.

        It --

Q.   I got it.  Yes.  Yes.  There is another date. Understood.

        And this is a chart you prepared, right?

A.   Yes.

Q.   And you are aware that HECC was a publicly traded company before October 29, 2015, right?

A.    Yes.

Q.    But obviously that's not included in the chart you prepared?

A.    Right.

Q.    And the decline in the share price that we see here, again, that's something you prepared, right?

A.    I prepared this chart.

Q.    Yes.

            And isn't it true, ma'am, that the price of oil, the drop in the price of oil would also reflect the drop in the share price of HECC stock?

A.    I don't know.

Q.    Did the government ask you to compare the price in the drop of HECC stock to the price of the drop in oil?

A.    No.

            MR. WRIGHT:  Just one moment, your Honor.

            (There was a pause in the proceedings.)

            MR. WRIGHT:  I believe I'm done.

            Thank you, your Honor.

            THE COURT:  Redirect examination.

            MS. FARRELL:  Just brief redirect, your Honor.

            THE COURT:  All right.

REDIRECT EXAMINATION

BY MS. FARRELL:

Q.    You mentioned during your direct testimony that blue

sheets can, I believe you used the word, double count

trades because of market makers, is that right?

A.    Yes.

Q.    Can you explain that?

      MR. RYAN:  Objection.

      MR. WRIGHT:  Objection.  Beyond the scope.

      MS. FARRELL:  It's not, your Honor.  The

relevance will become abundantly clear in my next

question.

      THE COURT:  I'll overrule it.

A.    As I mentioned, the blue sheets have every single

trade that was made.

      So it has the trade from the seller to the

market maker, from the market maker to the buyer.  So it

includes all of those -- every step of the way.  Sometimes

market makers have to buy from other market makers.

      So there's instances where a trade could be

triple counted even in the blue sheets.  What is reported

to Bloomberg and what is reported to the public in the

media is just the total volume from the buyer to the

seller.  All of the extra steps, all the market maker

transactions are not even reported to the public because

that's just like the oil in the machine.

      That's what's connecting the buyer to the

seller.

Q.   So when Mr. Wright read off the Bloomberg volume from
your chart and then compared it to a much larger number
that he had calculated from the blue sheets, was it likely
that he was double counting all of the market maker
activity?

          MR. WRIGHT:  Objection.

          THE COURT:  Sustained.

          MS. FARRELL:  Nothing further, your Honor.

          THE COURT:  Anything further, Mr. Wright?

          MR. WRIGHT:  Nothing, your Honor.

          THE COURT:  Thank you.

          You may step down.

          THE WITNESS:  Thank you.

          (Witness steps down.)

          MR. KNAPP:  Your Honor, before the government
calls its next witness we have just one more exhibit that
we propose to offer pursuant to Federal Rules of Evidence
803(6) and 901(11).

          It's marked as Government Exhibit 342 A for
identification and it is a Frontier Communications
subscriber record for telephone number 813-938-4596 in the
name of J Rogers, 5517 Golden Isles Drive, Apollo Beach,
Florida, 33572, e-mail address
JosephRogers730@Frontier.com.

          The government offers this exhibit at this time.